



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 28, 2023**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DUNTOV MOTOR COMPANY, LLC, | § | CASE NO. 21-40348-MXM-11 |
| | § | |
| DEBTOR. | § | CHAPTER 11 |
| | § | |

| | | |
|---|---|---|
| | § | |
| ALAN SEVADJIAN, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADVERSARY NO. 21-04030-MXM |
| | § | |
| TEXAS DEPARTMENT OF MOTOR VEHICLES, | § | |
| | § | |
| DEFENDANT. | § | |
| | § | |
| *CONSOLIDATED WITH* | § | |
| | § | |
| FRANCK MR. RADENNE, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| AND | § | |

| JOHN FRANKLIN COOLEY, JR., | § |
| | § |
|   INTERVENOR, | § |
| | § |
| V. | § |
| | § |
| DUNTOV MOTOR COMPANY, LLC; | § |
| ALAN SEVADJIAN; AND EDWRD SEVADJIAN, | § |
| | § |
|   DEFENDANTS. | § |

## <u>MEMORANDUM OPINION</u>
*[Relates to ECF No. 10]*

    The Court conducted a multi-day trial on (i) the Complaint[1] filed by Mr. Franck Radenne

("***Mr. Radenne***" or "*Plaintiff*"), (ii) the Intervention[2] filed by Mr. John Franklin Cooley, Jr. ("***Mr.***

***Cooley***" or "***Intervenor***"), and (iii) the Counterclaims[3] filed by Duntov Motor Company, LLC

("***Duntov***"), Mr. Alan Sevadjian ("***Alan***"), and Mr. Edward Sevadjian ("***Edward***") (Duntov, Alan

and Edward, together, the "***Defendants***").[4]

    This litigation centers around a project to build a vintage 1968 Corvette race car that would

both (i) qualify for racing in the Federation Internationale de L'Automobile (the "***FIA***") European

historic racing circuit, and (ii) be street legal and licensed for driving on public roads throughout

Europe. The disputes in this litigation were many, but principally center around (i) the 1968

Corvette's Vehicle Identification Number ("***VIN***"), (ii) the year the Corvette's frame—the initial

component used to begin the project—was manufactured by General Motors, and (iii) how long it

took to complete the project to build the vintage 1968 Corvette.

---

[1] *Plaintiff's Third Amended Complaint*, ECF No. 10 (the "***Complaint***").
[2] *Intervenor John Franklin Cooley, Jr.'s First Amended Petition in Intervention*, ECF No. 4-45 (the "***Intervention***").
[3] *Defendants' Third Amended Answer & Counterclaim Against Franck Radenne*, ECF No. 4-24 (the "***Counterclaims***").
[4] Although the Court would prefer to define all the individuals identified in this Memorandum Opinion by their given surnames, to avoid confusion, the Court decided to define Alan and Edward by their first names only. The Court intends no disrespect to any of the parties by using the first names of only Alan and Edward.

The Court reviewed and considered the pleadings and briefings filed in this adversary proceeding, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law,[5] as required by Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

## I.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district. This adversary proceeding constitutes core proceedings over which the Court has statutory and constitutional authority to enter final orders and judgments pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (I), (J), and (O). Even if this Court would not otherwise have the authority to enter a final judgment, all the parties have consented to the Court's issuance of a final judgment in this proceeding.[6] Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    BACKGROUND FACTS[7]

**A.    Mr. Radenne Begins His Pursuit to Acquire a Vintage Corvette for Both (i) Racing in the FIA European Historic Racing Circuit, and (ii) Driving on Public Roads Throughout Europe**

Plaintiff, Mr. Radenne, is a citizen of France and a vintage racing enthusiast and driver.[8]

In late 2017,[9] Mr. Radenne began his quest to buy a reconstructed and modified vintage Corvette

---

[5] Any findings of fact that should be more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

[6] ECF No. 1 at 3, ¶ 3 (Duntov), ECF No. 9 at 3, ¶ 4 (Mr. Radenne, Alan, and Edward each consented to this Court entering final orders on the record during the status conference held June 10, 2021 [ECF No. 14]); although Mr. Cooley failed to file his statement required by Bankruptcy Rule 9027(g)(3), Mr. Cooley's participation in this litigation constitutes the necessary consent, as further evidenced by the *Joint Pretrial Order* [ECF No. 190].

[7] Citations to (i) Plaintiff's Exhibits will be "R-Exhibit Number," (ii) Intervenor's Exhibits will be "C-Exhibit Number," and (iii) Defendants' Exhibits will be "D-Exhibit Number" Citations to witnesses' testimony will be to the applicable ECF Number, with pinpoint citations to page and line numbers.

[8] ECF No. 190 at pg. 5, ¶ 4.A.

[9] Testimony of Mr. Radenne, ECF No. 220, pg. 12, lines 22–25; pg. 14, line 1.

that would (i) qualify for racing in the FIA European historic racing circuit and (ii) be street legal and licensed for driving on public roads throughout Europe.[10]  Mr. Radenne initially thought he would like to find a reconstructed and modified vintage 1969 Corvette because he was born in 1969.[11]  But, Mr. Radenne ultimately decided to purchase a modified vintage 1968 Corvette race car.

Based on his research, Mr. Radenne determined that his best option was to find a business located in the United States that could reconstruct and modify a vintage Corvette because "[t]here were many, many cheap Corvettes, street legal Corvettes, in the U.S."[12]  Eventually, Mr. Radenne discovered Duntov through internet searches.[13]  He ultimately decided to contact the Defendants because they "specialized in classic Corvette restoration[,]"[14] and they also performed "modification of Corvettes for racing and they were racing themselves."[15]  Additionally, the fact that Duntov held a GM product license, provided Duntov with "a sign of credibility."[16]

## B.    Background and History of Duntov, Alan, and Edward

Defendant, Mr. Alan Sevadjian, is also a Corvette and racing enthusiast.  Alan attended his first race in 1956, and he acquired his first Corvette in 1963.[17]  After serving in the United States Navy, Alan became involved in vintage Corvette racing in 1979, and he has been involved with building vintage Corvettes and racing ever since.[18]

---

[10] Testimony of Mr. Radenne, ECF No. 220, pg. 11, lines 5–10.
[11] Testimony of Mr. Radenne, ECF No. 220, pg. 11, lines 5–6.
[12] Testimony of Mr. Radenne, ECF No. 220, pg. 13, lines 10–11.
[13] Testimony of Mr. Radenne, ECF No. 220, pg. 15, lines 1–2.
[14] Testimony of Mr. Radenne, ECF No. 220, pg. 15, lines 15–16.
[15] Testimony of Mr. Radenne, ECF No. 220, pg. 15, lines 20–21.
[16] Testimony of Mr. Radenne, ECF No. 220, pg. 15, lines 23–24.
[17] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 93, lines 6–10.
[18] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 93, lines 11–14 and pg. 95, lines 1–4.

Alan, along with two investing partners, formed Duntov.  Alan was the operations partner, whereas the two investing partners were not active in the daily operations of Duntov.[19]  Over time, the two investing partners' interest in Duntov "waned," and at some point, Alan acquired his partners' interests, resulting in Alan owning 100% of Duntov.[20]

Alan named Duntov Motor Company after a Russian engineer named Zora Arkus-Duntov. General Motors hired Mr. Arkus-Duntov in the mid-1950s, and "he became the Corvette champion"[21] within General Motors.  Alan testified that Mr. Arkus-Duntov "[s]aved the brand from extinction in the mid-50s and is just the most famous guy . . . in that era of Corvettes.  He was the first General Motors Corvette product manager, senior engineer, and he passed away in the early 90s."[22]  Alan believed that "it would be really cool if we could associate ourselves with his name."[23]  So, Alan "went to Detroit and asked his . . . widow if we could use his name and we made a deal that I would contribute to the National Corvette Museum for sales of the cars that we were building.  And she granted us the use of the family name."[24]

On or around March 2008, Alan resigned as the managing member of Duntov and transferred his 100% ownership interest in Duntov—two thirds ownership interest to his son, Defendant Edward Sevadjian, and one-third ownership interest to Mr. John Farnsworth.[25]  After conveying his 100% ownership interest to Edward and Mr. Farnsworth, Alan resigned as a managing member of Duntov, but he remained with Duntov as a "dad advisor" until Duntov was sold in 2022.[26]  At no time, however, did Alan have a written employee agreement with Duntov

---

[19] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 101, line 15 through pg. 102, line 5.
[20] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 101, line 19 through pg. 102, line 7.
[21] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 98, lines 18–19.
[22] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 98, lines 20–24.
[23] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 99, lines 1–2.
[24] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 99 lines 2–6.
[25] D-14; ECF No. 218, pg. 23, lines 2–10.
[26] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 60, lines 9–15.

that outlined his duties and responsibilities.[27]  Further, Alan did not receive a regular salary with Duntov, nor did Alan and Duntov have a written agreement documenting Alan's compensation arrangement with Duntov.  Rather, over the years, Duntov periodically paid Alan, as needed, to enable Alan to pay his living expenses.[28]  It was not until after Duntov filed its bankruptcy case that Duntov began paying Alan a regular salary.[29]

Defendant, Edward Sevadjian, like his father Alan, was also a life-long Corvette and racing enthusiast.  Edward began racing competitively when he was 8 years old in cart racing, and he eventually obtained several pro racing licenses and began racing Corvettes in 2005.  Edward also has been a race driving instructor.

Edward and Mr. Farnsworth were both managing members of Duntov from March 2008 until Mr. Farnsworth passed away in 2021.[30]  After Mr. Farnsworth passed, Edward became the sole managing member of Duntov, and he acquired Mr. Farnsworth's one-third ownership interest, resulting in Edward owning 100% of Duntov.[31]  Beginning March 2008, as the managing member of Duntov, Edward was responsible for overseeing Duntov's (i) racing activities, (ii) the car build and mechanics' work in the shop, (iii) finances, and (iv) other day-to-day operations and responsibilities of Duntov.[32]

In 2009, General Motors conveyed to Duntov a license to build certain "restomod" vintage Corvettes for General Motors.[33]  In addition to assembling and building vintage Corvettes, Duntov also began manufacturing parts for vintage Corvette race cars—including suspension components, brakes, steering, and all the specialty items that are required to convert an old remade Corvette

---

[27] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 60 at lines 18–23.
[28] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 60, line 24 through pg. 61, line 23.
[29] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 61, line 24 through pg. 62, line 5.
[30] Testimony of Mr. Edward Sevadjian, ECF No. 218, pg. 24, lines 1–3.
[31] Testimony of Mr. Edward Sevadjian, ECF No. 218, pg. 45, lines 15–23.
[32] Testimony of Mr. Edward Sevadjian, ECF No. 218, pg. 24, lines 4–14.
[33] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 96, lines 4–15 and pg. 97, lines 1–9.

into a competitive racing Corvette.[34]  It was these types of qualities, experience, and services of

which Mr. Radenne sought in a business to build a vintage 1968 Corvette race car.

C.     **Mr. Radenne Contacts Duntov and They Ultimately Execute a "Bill of Sale"**

On April 22, 2018, Mr. Radenne first contacted Duntov by email, stating:

> I would be interested to get a rough estimation of the budget necessary for
> the transformation of a Corvette C3 in order to participate in FIA historic
> racing in Europe.
>
> If I bring to Duntov a 1969 350 convertible, a race engine and I get most of
> the parts from you (transmission, clutch, breaks, roll-cage, lights,
> suspension, body extension, etc.), what would be approximate labor budget
> to prepare the chassis (welding for rigidity + paint), get most of the
> components installed (running stage) and get the car painted??[35]

On May 2, 2018, Alan replied to Mr. Radenne's April 22 email stating:

> In recent years *we have built over a dozen cars like the one you have
> described.  Building a car from scratch typically takes us between 1000 and
> 1500 hours, depending on the car*.
>
> Do you have a car in mind that you would be shipping to us?
>
> We have a 69 Corvette with a title in stock with a Duntov built roll cage
> already installed.  It was a project we started a few years ago, but the owner
> got sick, abandoned the project, and transferred ownership to us rather than
> pay his bill. That would be a great place to start – you wouldn't have to ship
> us a car.  . . . We had over $25,000 in the project before it was abandoned.
> You could start with this car for $10,000.  It is on a storage lift now. If you
> would like, I will have it moved down so it can be photographed.[36]

Over the next few weeks, the parties exchanged several emails, including an email dated

May 16, 2018, wherein Alan attached, among others, the following pictures of the Corvette frame,

---

[34] Testimony of Mr. Alan Sevadjian, ECF No. 221, pg. 99, lines 7–14.
[35] R-43, pg. 474.
[36] R-43, pg. DM000467 (emphasis added).

installed front-end fiberglass, and installed Duntov built roll cage (together, the "***Duntov Frame***")[37] that he had referenced in his May 2, 2018, email:



---

[37] R-153, pgs. RADENNE 000092–094; *see also* D-5.  The Duntov Frame is the grey frame in each of the pictures. The white and blue vehicle next to the Duntov Frame is not part of the 1968 Corvette or relevant to this litigation.





The Duntov Frame was the initial component that was ultimately used to build the 1968 Corvette that is the subject of this dispute.  In addition to the Duntov Frame, Alan represented to Mr. Radenne that Duntov also had in its possession a front-end body section that went with the Duntov Frame, but it was not mounted on the Duntov Frame or included in the above pictures.[38] Alan noted further that the 1968 Corvette could be built as either a roadster (convertible) or coupe.[39]

During his testimony, Mr. Radenne admitted that he understood that, when building the type of Corvette race car he was seeking to purchase, the finished Corvette would include many parts and components from years other than 1968, and that was acceptable to him "[a]s long as [the parts or components] are approved by the FIA, they are within the bracket and they are the same specifications. Yes."[40]

How Duntov came into possession of the Duntov Frame and the year the Duntov Frame was originally manufactured by General Motors are significant disputed issues that will be more fully addressed *infra* in Sections II.D. and II.F. of this Memorandum Opinion.

On May 30, 2018, Mr. Radenne sent a follow-up email to Alan stating, in part, "I still haven't got a chance to talk with my French FIA contact. . . . I (sic) get back to you right after I have my conversation with FFSA."[41]  On June 5, 2018, Mr. Radenne sent a follow-up email to Alan summarizing several issues and specifications that would be required by the FIA to proceed with the project.  One such requirement was the "[n]eed to make sure that VIN is visible also on

---

[38] R-153, pgs. RADENNE 000084–085.
[39] R-153, pg. RADENNE 000085.
[40] Testimony of Mr. Radenne, ECF No. 220, pg. 133, lines 2–8.
[41] R-77, pg. RADENNE 000123.

the rear side of the chassis."[42]  Over the next couple of days, Mr. Radenne exchanged emails and had a telephone conversation with Alan about the potential project.[43]

Mr. Radenne decided to proceed with the project to build a vintage 1968 Corvette race car and to purchase the Duntov Frame for $10,000 as a starting point.  Therefore, on June 8, 2018, Alan sent a proposed *Bill of Sale* to Mr. Radenne (the "***Initial Draft Bill of Sale***").[44]  The Initial Draft Bill of Sale incorporated Mr. Radenne's proposed purchase of the Duntov Frame (for $10,000) along with a list of initial parts, for an initial down payment of $29,553.92,[45] to be paid up front to begin the project.  The Initial Draft Bill of Sale also provided a detailed listing of the anticipated labor and additional parts and materials that would be necessary to complete the project to build the vehicle for an additional cost of $74,506.48 to be invoiced as the project progressed.[46]

Accordingly, the projected purchase price for a completed "***68 Corvette, VIN 1946785422741, complete and street legal with state inspection sticker, license plate, role cage, race prepared in primer***" (less paint) was initially expected to total $104,060.40.[47]  Finally, many parts listed in the Initial Draft Bill of Sale were non-original and non-1968 Corvette parts.  The overwhelming credible evidence clearly established that the project to custom build the 1968 Corvette race car detailed in the Initial Bill of Sale was intended by Mr. Radenne and the Defendants to be a "parts car" and not an original restoration.

The Initial Bill of Sale described the vehicle to be built as a "1968 Corvette VIN 1946785422741."[48]  When Mr. Radenne received the Initial Draft Bill of Sale, he was concerned that the VIN referenced in the Initial Draft Bill of Sale was not correct.  Each digit of a VIN has a

---

[42] R-77, pg. RADENNE 000121; *see also* testimony of Mr. Radenne, ECF No. 220, pg. 38, lines 9–25.
[43] R-77, pg. RADENNE 000118–120.
[44] D-6, pgs. 1–3.
[45] D-6, pgs. 1–3.
[46] D-6, pg. DM000007.
[47] D-6, pg. DM000007 (emphasis in original).
[48] D-6, pgs. 1–2.

particular purpose, and in this case, the 4th, 6th, and 7th digits of the VIN are particularly relevant in this dispute.  As previously noted, the VIN is a significant disputed issue that will be more fully addressed throughout this Memorandum Opinion.

Initially, Mr. Radenne observed that the 7th digit of the VIN referenced in the Draft Bill of Sale was the number "**5**" as opposed to the letter "**S**."[49]  Mr. Radenne knew that the 7th digit of a Corvette VIN should have been the letter "S" as opposed to the number "5" because the 7th digit of a VIN for a General Motors manufactured Corvette is a letter indicating the city where the car was manufactured.  At that time, General Motors manufactured Corvettes only in St. Louis, Missouri, which is why Mr. Radenne expected the 7th digit of the VIN to be the letter "S" as opposed to the number "5".[50]  Therefore, Mr. Radenne sent a reply email on June 20, 2018, asking Alan "[a]bout the contract, may I ask you to review the VIN code since it looks strange? . . .  I believe a 'S' has been mistaken as a '5'"[51]

Later that day, Alan replied stating "Good eye! That was my fault entirely.  You are correct, the '5' in the middle was supposed to be an 'S', and there were was (sic) an extra '2' in the middle of the sequence #."[52]  Alan confirmed further that "[t]he car has to match the title and the bill of sale for everything to work."[53]  Alan also attached a revised Bill of Sale (the "***Final Bill of Sale***") revising the VIN for the Duntov Frame as 194678S422741.[54]  Later that same day, Mr. Radenne sent another follow-up email requesting Alan to "confirm the address of your bank . . . [and] . . .

---

[49] Testimony of Mr. Radenne, ECF No. 220, pg. 50, line 7 through pg. 51, line 4.
[50] Testimony of Mr. Radenne, ECF No. 220, pg. 50, line 7 through pg. 51, line 4; *see also* testimony of Mr. Mackay, ECF No. 211, pg. 18, lines 13–15.
[51] D-6, pgs. RADENNE 000111–112.
[52] D-6, pg. RADENNE 000112.
[53] D-6, pg. RADENNE 000112; *see also* testimony of Mr. Alan Sevadjian, ECF No. 221 at pg. 31, lines 1–19.
[54] D-6, pgs. RADENNE 000006–008 (page 2 of the Final Bill of Sale, however, did not correct the VIN – D-6, pg. DM 000007).

[c]an you also confirm the presence of the VIN *on the back of the chassis*." To which, Alan immediately replied "Yes, confirming both."[55]

The above email exchanges are a primary focus of Mr. Radenne in this litigation. These email exchanges, however, should not be analyzed and interpreted in isolation. Rather, they must be analyzed and considered in context with all the communications that took place between Mr. Radenne and the Defendants throughout their entire business relationship to arrive at a proper interpretation and conclusion regarding these specific emails.

On June 21, 2018, Mr. Radenne signed and returned the Final Bill of Sale (see next page) to Duntov, and the project to build the 1968 Corvette commenced.[56]

*[remainder of page intentionally left blank]*

---

[55] D-6, pg. RADENNE 000111; R-77, pg. RADENNE 000111; *see also* testimony of Mr. Alan Sevadjian, ECF No. 221 at pg. 31, lines 1–11.
[56] D-6, pgs. RADENNE 000111; RADENNE 000125; and DM000006–008.



**GM** OFFICIAL LICENSED PRODUCT

*Duntov Motor Company, LLC*

*Corvette*

email: alan@duntovmotors.com        Phone: (972) 243-3838        FAX: (972) 243-3828

*Bill of Sale*

*8 June, 2018*

Seller:                                          Buyer:
Duntov Motor Company, LLC                        Franck Radenne
13906-C Denton Drive                             France
Farmers Branch, TX  75234                        radennef@yahoo.com

Description of Vehicle:

1968 Corvette VIN **194678S422741**, in primer as per the attached specifications

Price as specified on the enclosed sheet:  **$29,553.92**

Terms:  Payable by bank wire, instructions enclosed

Warranty:

Buyer acknowledges **THERE IS NO WARRANTY ON THE VEHICLE, and the SELLER EXPRESSLY DISCLAIMS ALL WARRANTIES EITHER EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.**

Duntov Motor Company, LLC                        Franck Radenne

_____                          _____
Alan Sevadjian

**RADENNE 000125**

14

***68 Corvette, VIN 1946785422741, complete and street legal with state inspection sticker, license plate,***
***roll cage, race prepared frame, in primer.*** Added 6/9/18 - Spare set of wheels, No Charge

| | | |
|---|---|---|
| Untouched car as it sits in the Duntov shop | 10,000.00 | |
| Rear body section and top (roadster with removable top or T-Top coupe) | 2,200.00 | |
| Hood, inner fenders, and door handless | 1,440.00 | |
| **Total for the car with Complete Body** | | **13,640.00** |
| ***Duntov Catalog Parts:*** | | |
| RS022: Rear Set Single Adjustable Duntov Racing Shocks (priced as car set for discount) | 409.00 | |
| R020: Duntov F41 7-Leaf Steel Spring - *Substitute racing spring at no additional charge* | 229.00 | |
| R054 Long Bolt Spring Bolt Kit | 68.00 | |
| NPN: Balanced driveshaft | 450.00 | |
| NPN: Stock Aluminum Bellhousing | 150.00 | |
| NPN: Zbar, rods, clutch fork and throw out bearing | 300.00 | |
| RS444: Duntov Racing Trailing Arm Assembly with Parking Brake | 2,466.00 | |
| RS460: Duntov Racing Strut Rod Set | 649.00 | |
| RS540: Car Set of Bump Steer Block Assemblies | 243.00 | |
| RE200: Substitute for Tilton Clutch Assembly (for FIA) | 760.00 | |
| NPN: New Duntov M22 Racing Transmission | 2,850.00 | |
| RD950: Aluminum Front Diff Mount | 54.00 | |
| RF300: Axle Set of Stock L88 Flares | 550.00 | |
| RF600: L88 Headlight Kit | 990.00 | |
| RD130 Racing Diff | 2,785.00 | |
| F010 Front End Assy | 2,070.00 | |
| Add for Substitute Spherical Bearing Upper A-Arms | 551.00 | |
| Add for Substitute Spherical Bearing Lower A-Arms | 383.00 | |
| Add for Substitute Racing Front Hubs | 90.00 | |
| Add for Substitute single adjustable front shocks | 316.00 | |
| D085 3" Half Shaft Assemblies (x2) | 438.00 | |
| S020 69-82 Steering Gear Box | 249.00 | |
| RS520 Duntov Racing Big Block Drag Link | 452.00 | |
| S100 63-82 Manual Steering Pitman Arm | 99.00 | |
| R040 63-77 2.25" rear Spring Mount Plate Kit | 64.00 | |
| D105 63-77 Loaded Xmbr | 419.00 | |
| Total | 18,084.00 | |
| Less 12% | (2,170.08) | |
| **NET Initial List of Duntov Parts** | | **15,913.92** |
| **Total for the car and Original List of Parts** | | **29,553.92** |
| | | *(Amount Paid)* |
| ***Labor & Materials to Complete the Car (less paint)*** | | |
| Labor to remove forward section of roll cage, remount internal front crash bar, repair firewall | 1,200.00 | |
| Stock type pedal assembly | 500.00 | |
| FIA approved fuel cell and electric fuel pump | 2,000.00 | |
| Radiator and radiator core support & mounting brackets | 1,200.00 | |
| FIA spec legal FIA 427 iron block dry sump engine with orig  Chev iron block, New Chevrolet alum heads | 20,000.00 | |
| Dry sump system - tank, pump, filters, lines, etc. | 5,000.00 | |
| Mounted ceramic coated off the shelf headers and side pipes | 1,700.00 | |
| Labor and Materials to paint frame firewall, etc | 2,000.00 | |
| Labor to mount the body, mount the doors | 7,000.00 | |
| Labor and materials to mount the flares, headlights, prepare the body and paint in primer | 8,000.00 | |
| *Unrestored front and rear bumpers* , fabricated bumper mounting brackets | 1,450.00 | |
| Mounted front grills and grill molding (15 pieces) | 1,725.00 | |
| Labor to install the parts, wire the car, install fuel, oil and brake lines, fab bumper brackets | 7,425.00 | |
| The other axle set of L88 Flares (we only spec'd out one set originally) | 550.00 | |
| (1) axle set Delco J-56 brakes (less 12%), Duntov Part # RB117 | 1,315.60 | |
| (1) axle set Delco single pin brakes (less 12%), Duntov Part # B033 | 298.32 | |
| (1) axle set single pin racing brake pads (to match front), Duntov Part # RB164 | 177.76 | |
| Car set vented rotors (less 12%) RB152 | 294.80 | |
| Windshield, windshield wipers, steering column w/ turn indicators, horn, steering wheel | 2,275.00 | |
| Engine Oil cooler | 360.00 | |
| Electric fan (for the street), radiator expansion tank, hoses, belts | 420.00 | |
| Used street car seats for export, with new 1968 style seat belts | 900.00 | |
| Interior aluminum work, back deck, dash + Corvette dash pad and console | 3,340.00 | |
| Gauges, tail lights, rain light, battery, cables, switches, MSD, coil, alternator, etc. | 3,515.00 | |
| Fuel and hydraulic lines, master cylinder, hydraulic fluid, bleed the brakes | 1,060.00 | |
| Used American Racing wheels and 4-cycle old Hoosier Racing Tires | 800.00 | |
| ***Sub Total for Labor & Materials to Complete the Car (less paint)*** | | **74,506.48** |
| **Total Labor, Originally Quoted and Additional Materials** | | 74,506.48 |
| **Total for the Street Legal Race-ready 68 Corvette, with Texas State Inspection Sticker** | | **104,060.40** |

*$74,506.48 balance to be paid as progress payments, anticipated to be at least $10,000 per month until completion.*

DM000007



**Terms and Conditions:**

1  The detailed quotation for the car is enclosed.  The total price for the car and originally specified parts is **$29,553.92** which is due and payable upon acceptance of this proposal.  A Bill of Sale is included for the car , and upon payment you will be the legal owner of the car and associated parts.  This Bill of Sale should work for shipping purposes.

2  The balance of the parts and labor for the Project comes to **$74,506.48**, to be invoiced as the project progresses.  We will make every effort to complete the car and have it registered and race ready for the event at Circuit of the Americas, November 1-4, 2018. If the car is completed in time,  Duntov will crew the car for you at this event and you will only be responsible for the entry fee (about $1,200) and consumables - tires, brake pads, race gas, ect.  We will make sure you will have a license as long as you have a completed approved physical.

3  There are about four and a half months between now and the race at Circuit of the Americas.  We will not rush the car to make that race, but the offer is there if it is completed in time.  This offer is transferable to whatever race is next on the Duntov racing calendar after the car is completed.

4  Duntov will invoice you monthly with pictures of the progress as the car is being completed.  Work will begin immediately, and you will get your first pictures within a week.

5  Wiring Instructions for initial payment:

Account:

   **Duntov Motor Company, LLC**
   **13906-C Denton Drive**
   **Farmers Branch, TX  75234**

   **United States Federal EIN # 51-0554721**

   **Wells Fargo Bank, Dallas Texas**

   **Bank Wire Number: 121000248**

   **Account Number: 94 733 98 072**

   **Routing Number: 111900659**

   **Swift Code: WFBIUS6S**

   **Amount:  $29,533.92 U. S.**

DM000008

The above Final Bill of Sale included a section titled "***Terms and Conditions***" which provided, in part, that the Defendants would "make every effort to complete the car and have it registered and race ready for the event at Circuit of the Americas, November 1-3, 2018."[57]  But, as Alan noted in his first communication with Mr. Radenne that "building a car from scratch typically

---

[57] D-6, pg. 3.

takes us between 1000 and 1500 hours,"[58] the November 1-3, 2018 timeline appeared unrealistic. Ultimately, Duntov did not complete building the 1968 Corvette until around January 9, 2020.[59]

Between April 22, 2018 (when Mr. Radenne first contacted the Defendants) and June 21, 2018 (when Mr. Radenne signed the Final Bill of Sale), Mr. Radenne did not inquire about or request from the Defendants a detailed history of the Duntov Frame or its VIN.  Nor did any of the Defendants provide Mr. Radenne with any such detail or information.  Mr. Radenne contends, in part, that the Defendants intentionally withheld the detailed history of the Duntov Frame and its VIN from Mr. Radenne to fraudulently induce him to sign the Final Bill of Sale, purchase the Duntov Frame, and begin the project to build the 1968 Corvette.[60]  Based on the credible evidence in the record detailed in this Memorandum Opinion, the Court disagrees.

**D.      The History of the Duntov Frame and VIN Prior to the Defendants Acquiring the Frame**

To fully understand and properly analyze the disputes between each of the parties, it is necessary to understand the history of the Duntov Frame and its VIN prior to the Defendants acquiring the Duntov Frame in 2015.  The credible evidence suggests that the Defendants did not know much of the detailed history of the Hanna Frame (defined below) and its VIN when they acquired it in 2015.  Rather, they researched and learned the history of the Hanna Frame and its VIN on or around mid-February 2019.[61]

***1.      In 2007 Mr. Hanna acquired the Hanna Frame and filed suit in Brown County, Texas in 2012 to obtain a VIN and Certificate of Title for the Hanna Frame***

The Defendants acquired the Duntov Frame in 2015 from Mr. Omer Hanna ("***Mr. Hanna***"). On or about May 15, 2007, Mr. Hanna acquired a "1968 Corvette Convertible Body" (the "***Hanna***

---

[58] R-43, pg. DM000467.
[59] Testimony of Mr. Alan Sevadjian, ECF No. 221 at pg. 173, line 23 through pg. 174, line 1; testimony of Mr. Edward Sevadjian, ECF No. 218, pg. 188, lines 6–9.
[60] Testimony of Mr. Radenne, ECF No. 220 at pg. 63, lines 21–23.
[61] D-27, pg. DM000061; testimony of Mr. Alan Sevadjian, ECF No. 221 at pg. 39, line 23 through pg. 174, line 1.

*Frame*") from Mr. Marlin R. Scott ("***Mr. Scott***") for $1,500.[62]   The uncontroverted evidence

suggests that Mr. Hanna either never had or had lost his title to the Hanna Frame.[63]   Therefore, on

May 21, 2012, Mr. Hanna filed a *Plaintiff's Original Petition* in the County Court of Brown

County, Texas, (the "***Brown County Court***" and the ***"Brown County VIN Litigation***") "requesting

the Court order the [Texas Department of Motor Vehicles] to issue a Vehicle Identification Number

(VIN) and Certificate of Title to [Mr. Hanna] on a vehicle 1968 Corvette VIN # 194678*5*422741."[64]

The uncontroverted evidence further suggests that the procedure to obtain a new court

ordered VIN and Certificate of Title in Texas requires, in part, that an anti-theft officer of the local

police department examine the vehicle to confirm the VIN and to verify that the vehicle was not

stolen.[65]   Apparently, when the Texas State Trooper inspected the Hanna Frame he mistakenly

recorded the 7th digit on the VIN of the Hanna Frame as a "5" as opposed to an "S,"[66] which was

then used by Mr. Hanna when he filed his Brown County VIN Litigation.[67]

On June 5, 2012, the presiding Judge in the Brown County VIN Litigation issued an *Order*

providing, in part:

> [T]he Court having heard the testimony and evidence and argument of the
> Plaintiff, is of the opinion that title to the 1968 Corvette, VIN#
> 194678*5*422741, is vested in Omar J. Hanna.
>
> It is the further finding of the Court that the motor vehicle in question was
> originally manufactured by Chevrolet as a competitive race car, and that the
> only VIN assigned to the motor vehicle was for the vehicle frame, and not
> for ancillary parts or the engine.
>
> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the
> title to the 1968 Corvette, VIN# 194678*5*422741, is truly and properly

---

[62] R-44, pg. DM000590 and D-2, pg. DM000590.
[63] R-23, pg. DM000077.
[64] R-44, pg. DM000581 (emphasis added) and D-2, pg. DM000581 (emphasis added).
[65] D-27, pg. DM000061; R-23, pg. DM000077.
[66] R-44, pg. DM000075.
[67] R-23, pg. DM000077.

vested in the Plaintiff, Omar J. Hanna, and the Court directs The Texas Department of Transportation to issue a title to said vehicle.[68]

On June 20, 2012, the presiding Judge in the Brown County VIN Litigation issued an *Amended Order*.[69]  The Amended Order changed the VIN # in the original Order to replace the number "5" in the 7th digit of the VIN to the letter "S."  Additionally, the Amended Order provided further, in part:

> [T]he Court having heard the testimony and evidence and argument of the Plaintiff, is of the opinion that:
>
> Title to the 1968 Corvette, including the vehicle frame with the VIN# 194678*S*422741, is vested in Omar J. Hanna.
>
> The vehicle identification number has been removed from the body of the 1968 Chevrolet Corvette (the vehicle that is the subject of this Order);
>
> Good cause exists to assign the VIN# 194678*S*422741 (of the 1968 Chevrolet Corvette frame) to the 1968 Chevrolet Corvette.
>
> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:
>
> The title to the 1968 Chevrolet Corvette including the 1968 Chevrolet Corvette frame, VIN# 194678*S*422741, is truly and properly vested in the Plaintiff, Omar J. Hanna;
>
> And the Court directs The Texas Department of Transportation to issue a title to said 1968 Chevrolet Corvette to Omar J. Hanna, and to reassign as the VIN for said vehicle the existing VIN 194678*S*422741 (currently on the frame of said vehicle).[70]

Finally, on June 29, 2012, the presiding Judge in the Brown County VIN Litigation issued a third order—the *Corrected Order*[71] (which, as detailed later in this Memorandum Opinion, was the order Edward sent to Mr. Radenne on October 31, 2019)  The Corrected Order was identical to the Amended Order except (i) it changed the VIN # back to "194678*5*422741"—changing the

---

[68] R-44, pg. DM000589 (emphasis added) and D-2, pg. DM000589 (emphasis added).
[69] R-44, pg. DM000592 (emphasis added) and D-2, pg. DM000592 (emphasis added).
[70] R-44, pgs. DM000592–593 and D-2, pgs. DM000592–593.
[71] R-44, pgs. DM000595–596 and D-2, pgs. DM000595–596.

7th digit from the letter "S" back to the number "5," and (ii) corrected the spelling of Mr. Hanna's first name.  There is no evidence in the record to explain why the Brown County Court flip-flopped the 7th digit in the VIN # from the number "5" to the letter "S" and then back to the number "5." But the orders by the Brown County Court support the logical inference that there was substantial confusion about the Duntov Frame's VIN long before Mr. Radenne approached Duntov to build the 1968 Corvette.  And, as previously noted, the credible evidence further suggests that neither Alan nor Edward knew or had reason to know this history concerning the Hanna Frame until months after Duntov and Mr. Radenne signed the Final Bill of Sale.

> ### 2.  *Mr. Hanna works on the Hanna Frame which is then modified and conveyed to Duntov, and is ultimately sold to Mr. Radenne*

At or about the time Mr. Hanna acquired the Hanna Frame in 2007, he began working as an employee for Duntov.[72]  Mr. Hanna brought the Hanna Frame to the Duntov's facilities so he could work on it during his spare time.[73]  While working for Duntov, Mr. Hanna installed a Duntov built roll cage onto the Hanna Frame—which is the "Duntov built roll cage" that is included in the definition of the Duntov Frame as defined *supra* in Section II.C. of this Memorandum Opinion.[74]

In 2015, Duntov agreed to purchase the Duntov Frame (and other items not relevant to this litigation) from Mr. Hanna, and Mr. Hanna conveyed his title to the Duntov Frame to Alan.[75]  The Duntov frame was then stored in the Duntov facility, where it stayed until it was sold to Mr. Radenne in 2018.[76]

---

[72] Testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 21, line 24 through pg. 24, line 20; pg. 86, line 20 through pg. 88, line 6; pg. 104, line 24 through pg. 107, line 18; pg. 109, lines 3–21.
[73] Testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 21, line 24 through pg. 24, line 20.
[74] Testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 21, line 24 through pg. 24, line 20.
[75] D-23.
[76] Testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 88, lines 2–6.

Although Mr. Hanna signed the *Texas Certificate of Title*[77] conveying legal title of the Duntov Frame to Alan, both Alan and Edward testified credibly that Duntov paid for the Duntov Frame, and it was always their understanding and intent that Duntov was the beneficial owner of the Duntov Frame.[78] The Court found the testimony of Alan and Edward was credible concerning the legal versus equitable ownership of the Duntov Frame and the ability of Duntov to convey title of the Duntov Frame to Mr. Radenne.

### E.        The Project to Build the 1968 Corvette Encounters Delays

Mr. Radenne and the Defendants were hoping for a smooth and enjoyable ride transforming the Duntov Frame into a vintage 1968 Corvette that Mr. Radenne could (i) race in FIA racing circuit events and (ii) drive legally on public roads throughout Europe. Unfortunately, over the ensuing months, the project encountered many extended delays—some of which were caused by the Defendants, while others were caused by Mr. Radenne.[79] As the project encountered extended delays, the relationship between Mr. Radenne and the Defendants soured and eventually veered offtrack into litigation.

#### 1. *The initial months of the project were a relatively smooth ride*

From June 2018 through November 2018, Mr. Radenne and the Defendants maintained good communication and the project "was progressing quite well."[80] Mr. Radenne testified that in November 2018, however, he "started to have less and less feedback from Alan."[81] Therefore,

---

[77] D-23.

[78] Testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 21, lines 17–18; *see also* testimony of Mr. Edward Sevadjian at ECF No. 218, pg. 38, line 22 through pg. 39, line 24; pg. 85, line 20 through pg. 86, line 3.

[79] Testimony of Mr. Alan Sevadjian, ECF No. 221 at pg. 129, line 1 through pg. 134, line 16 (describing several modifications to the vintage 1968 Corvette being built were requested by Mr. Radenne during the process); *see also* pg. 161, lines 2–15. *See also* testimony of Mr. Edward Sevadjian, ECF No. 218, pg. 93, line 18 through pg. 94, line 12; pg. 159, lines 16–22. One such change required by Mr. Radenne was that the Duntov built roll cage had to be replaced with a new roll cage to comply with FIA requirements. *See* Testimony of Mr. Alan Sevadjian at ECF No. 221 at pg. 129, lines 1–22; pg. 133, lines 1–9.

[80] Testimony of Mr. Radenne, ECF No. 220 at pg. 74, line 16.

[81] Testimony of Mr. Radenne, ECF No. 220 at pg. 74, lines 16–19.

around that time, Mr. Radenne decided to travel to the United States to inspect the car and see the progress made on the project.[82]

### 2. *Mr. Radenne travels to the United States in February 2019 to view the progress in building the 1968 Corvette*

Mr. Radenne traveled to the United States and met with Alan and Edward at Duntov's shop on February 8, 2019. Alan did not stay long as he was feeling ill,[83] but Edward spent several hours with Mr. Radenne that day. Mr. Radenne testified that, when he arrived at the Duntov shop, "I was expecting to see the car almost complete or even to test drive the car, but – but, no, the car was still in little – in pieces. They had the transmission on the floor. . . . I mean there was nothing built in the car at the time. . . . The car was still kind of empty shell."[84] Mr. Radenne testified further that he "spend a bit of time around the car . . . trying to find actually the VIN numbers. I didn't see any. And then I spent a bit of time with Edward Sevadjian and we reviewed some details about the completion of the car."[85]

Mr. Radenne testified further that he asked Edward about the VIN. Edward told Mr. Radenne that he had just received a new VIN plate to reflect the "S" in the 7th digit in the VIN, but that he still needed to fix the discrepancy between (i) the Certificate of Title (reflecting a "5" in the 7th digit), (ii) the Final Bill of Sale (reflecting a "S" in the 7th digit), and (iii) the new VIN plate (reflecting a "S" in the 7th digit).[86] Mr. Radenne testified that this conversation with Edward was the first time the he was told there was a discrepancy between the Certificate of Title, the Final Bill of Sale, and VIN.[87] But Mr. Radenne admitted that when he and Edward were talking about

---

[82] Testimony of Mr. Radenne, ECF No. 220 at pg. 74, line 23 through pg. 75, line 3.
[83] Testimony of Mr. Alan Sevadjian, ECF No. 221 at pg. 132, lines 9–17.
[84] Testimony of Mr. Radenne, ECF No. 220 at pg. 76, lines 10–18.
[85] Testimony of Mr. Radenne, ECF No. 220 at pg. 76, line 25 through pg. 77, line 6.
[86] Testimony of Mr. Radenne, ECF No. 220 at pg. 78, lines 3–9.
[87] Testimony of Mr. Radenne, ECF No. 220 at pg. 77, line 22 through pg. 78, line 9.

the discrepancy, "I don't think we spoke much about that, just that there was a discrepancy and he

didn't make a big deal of that. So I didn't."[88]

### 3. Mr. Radenne returns to France, makes an additional progress payment, makes further inquiries about the VIN, and inquires about the time-period to finish the project

On February 12, 2019, after Mr. Radenne returned to France, Alan sent Mr. Radenne an

email attaching an Original Invoice in the amount of $10,000 representing Progress Billing #5 in

the project.[89]  Mr. Radenne paid the $10,000 for Progress Billing #5 on February 19, 2019.[90]

On February 14, 2019, Mr. Radenne sent Alan a couple of emails.  The first email

expressed, in part, Mr. Radenne's disappointment in "the stage of construction of the car[,]" and

he also stated "[a]s I explained to Edward, *I will need to get the car in not too long*. Taking into

account the time necessary for shipment, receiving, preparation for inspection, submission, and

most certainly the necessary adjustment. I have still a chance to race one by the end of the

season."[91]  This email was the first time Mr. Radenne raised a concern about the time-period within

which the Defendants would need to complete the project.

Mr. Radenne then sent a second email to Alan on February 14, 2019, asking:

> By the way, it seems that there is a discrepancy between the chassis number
> and the number reported on the documents: A "S" (for St Louis) has been
> misreported as a "5" on the ownership documents What can be done here?
> I cannot imagine that we change the chassis number since the code (and the
> S) has a specific meaning and will be used by both the FIA and the french
> (sic) administration for the road registration.  Can we get the paperwork
> amended?[92]

On February 15, 2019, Alan sent the following response to Mr. Radenne:

---

[88] Testimony of Mr. Radenne, ECF No. 220 at pg. 78, lines 15–19.
[89] D-8, pg. DM000001; *see also* D-9, pg. DM000082.
[90] R-21, DM000061; *see also* testimony of Mr. Radenne, ECF No. 220 at pg. 107, lines 1–3.
[91] D-9, pg. DM000081 (emphasis added).
[92] R-23, pg. DM000077–078.

You mentioned this anomaly when you first got a copy of the title. *I have since found the story behind '5' vs. S' as follows*:[93]

The car lacked a GM VIN number because the windshield frame to which it was attached had been removed in preparation for racing. The owner at the time had lost the title, and the procedure to acquire a new title involved having a State Trooper examine the vehicle, get the serial number off of the frame and create a new VIN plate with that number and affix it to the car. Since there was no windshield post, it was affixed to the hinge pillar, drivers side (see below).



The factory VIN number is stamped on top of the frame rail on the driver's side in the middle of the door opening. The officer made an error and an S' was recorded as a '5'. I did a search of the VIN number with a 5 and also with an S, and there is no issue with the title either way. I have had a new proper GM VIN number made that shows the S' instead of the '5'.

---

[93] R-23, pg. DM000077 (emphasis added).



If you like, I will make the appropriate inquiries to establish the procedure of issuing a new title with the proper VIN number. The State has the records of the issuance of the incorrect VIN in its records.[94]

On February 19, 2019, Mr. Radenne sent a follow-up email with the subject line "VIN number" to Alan and Edward:

> I would like to clarify this issue of VIN number.
> As far as I know, the VIN number is printed in the window frame and the back of the chassis.
>
> Referring to your emails of June 20th last year, the VIN should be present on the back of the chassis.
>
> We also discussed back then about the number of the windshield frame. On the first pictures you provided me of the car, the frame was cut above the position of the VIN number (copied). And as far as I remember, that's something you confirmed when I mentioned it was important to have this number.
> *When I came to visit you, I think I was actually able to see a number on the frame, which has been painted over now.*
>
> You also made clear about the fact that the car, the bills of sale and the title (to my name) should have the same VIN Number.
>
> So, I don't quite understand your statement that "The car lacked a GM VIN number because the windshield frame to which it was attached had been removed in preparation for racing."
>
> Since this is important matter to prove the age of the car (and therefore the racing category) as well as to get it road registered in France, may I ask you please to check this part and to send me pictures of the chassis & frame numbers? If the frame number is missing, I believe the chassis number is good enough.[95]

---

[94] R-23, pg. DM000077–078.
[95] D-27, pg. DM000065 (emphasis added); R-21, DM000069 (emphasis added); *see also* testimony of Mr. Radenne, ECF No. 220 at pg. 78, line 17 through pg. 79, line 1.

25

Later that day, Alan sent the following reply email to Mr. Radenne:

> When the previous owner bought the car, it had no windshield post at all, and therefore no traditional VIN plate. The complete removal of the windshield posts was the style for many roadsters run back in the day. The previous owner installed the stubby windshield posts when he planned on running the car as a roadster. When we got the car it had the stubby windshield posts, absent the traditional VIN number plate.
>
> I spent the morning researching the title issue. I drove over to the regional headquarters of the Texas Department of Public Safety and talked face to face with a key person. She was able to call up the VIN number (with the 5) to see that what I told here was true. She told me that in order to change it to an S would require three things: A copy of the court order that authorized the State to issue a title with the VIN number with the 5, an inspection of the car by an Anti Theft Officer of our local police department that will generate a '68-A' inspection report, and then I would need to take the 68-A and the original court order to the Dallas County courthouse to get a new court order that directs the State to issue a new title with the S.
>
> I came back to the office and called the Brown County Clerk who was able to put her hand on the document I requested.  She directed me to send her $6 to get a Certified Copy.  I have sent my letter request along with my money order for $6. When I receive the document, I will call for the inspection and then petition the Dallas County Court to issue the appropriate instruction. All of this should be done in the next few weeks, given the usual pace of government workers.[96]

The next day, February 20, 2019, Mr. Radenne sent the following reply email to Alan:

> Thank you very much for the time consuming work.  I hope you understand that this is important.  Please, don't forget to send me a picture of the VIN chassis number at your earliest convenience.
>
> . . .
>
> PS: Invoice #5 have been paid yesterday.  It should be on your bank account soon.[97]

Although Mr. Radenne testified that neither Alan nor Edward sent him a picture of the VIN

chassis number as requested in his February 20, 2019 email, Mr. Radenne sent Alan and Edward

---

[96] R-21, DM000061.
[97] R-21, DM000061.

an email a month later, on March 21, 2019, stating, "I assume that all the points are now clarified **and that the correction of the VIN number is moving forward**."[98]   In that same email, Mr. Radenne noted that he had just learned that the 1968 Corvette "needs to look like one of the cars that participated to (sic) FIA races in 1973.  It must have the same body components . . . don't ask me why."  But that the "good news" was that he had "identified a 1968 L88 corvette that raced until 1973" and "[t]his is one of the few coupes to have raced, and the only difference I see **with the car you are building** is the mirror used."[99]   Mr. Radenne's testimony at trial that he was not interested in purchasing a "parts car"[100] is not credible and contrary to the many communications, including this email, between Mr. Radenne and the Defendants.

### 4.  *Mr. Radenne insists on a final deadline for the defendants to complete the project*

Between March 2019 through August 2019, the record suggests that little progress was made on the project.  Because of the lack of meaningful progress, Mr. Radenne sent the following email to Edward on August 21, 2019, insisting on a deadline to finish the project:

> Hi Edward,
>
> Sorry to insist, but I need to share with you my deadlines.
> Where I live, there is usually heavy snow from end of December to end of April; period during which it will be impossible for me to bring back my car.  This means that the car needs to leave your shop, either before end of October or after end of February (it needs 2 months for shipment).
>
> You can understand why I would like to get that project finalized as soon as possible; especially since it has been initiated a bit more that 1 year ago.[101]

This email was the first time Mr. Radenne insisted on establishing a firm deadline for the Defendants to complete building the vintage 1968 Corvette.[102]

---

[98] R-16, DM000050 (emphasis added).
[99] R-16, DM000050 (emphasis added).
[100] Testimony of Mr. Radenne, ECF No. 220 at pg. 152, lines 15–22.
[101] D-27, DM000035; *see also* testimony of Mr. Radenne, ECF No. 220 at pg. 141, line 22 through pg. 142, line 8.
[102] Testimony of Mr. Radenne, ECF No. 220 at pg. 165, lines 16–24.

Becoming more frustrated with the Duntov's lack of progress, Mr. Radenne sent Edward an email on October 15, 2019, stating, in part:

> Please can you confirm approx number of days spent on the car since March??
>
> Also, VERY, VERY important:  I still have no proof that this car is the one I purchased (chassis number corresponding to the Bill of Sale).  **I am insisting to get a copy of the corrected paperwork no later than end of this week, 18 October 2019.**[103]
>
> I know that this project is not a priority for Duntov . . . [i]f you cannot make that make that finalize this project within these timelines (which is **already** about 10 months late vs. the original plan), *I will give up this project and request my investment back.*[104]

There is no evidence in the record that the Defendants responded to Mr. Radenne's demand for the court order addressing the VIN issue by October 18, 2021. On October 21, 2019, Mr. Radenne emailed both Alan and Edward summarizing the timeline of the events of the previous 16 months and demanding a refund by October 31, 2019.[105]

On October 21, 2019, Edward sent an email response to Mr. Radenne stating:

> Making progress here. The wiring harness is built and being installed. Gauges will be installed this week. I checked with Alan on the documentation. *He secured a court order*[106] to get the title fixed, awaiting inspection. When we are don't (sic) working on it, we will get the inspection and the judge will issue the new title. I have yet to get the hours together on the car but *I think we will have it ready to ship in 6 weeks or less.*[107]

October 27, 2019, Mr. Radenne sent Edward another follow-up email stating, in part:

> While I am surprised with your unusual responsiveness to my last email and apparent sudden 'progress' on this project, . . . [m]y trust in your ability to

---

[103] R-9, DM000034 (emphasis in original).

[104] D-27, DM000034 (emphasis added).

[105] R-3, pgs. DM000019–020.

[106] This statement was false.  But, based on the entire record, the Court finds and concludes that Edward was confusing the *Corrected Order* issued in 2012 by the County Court of Brown County with the updated order that Duntov would need to obtain after the 1968 Corvette was complete (in order for the VIN to match on the 1968 Corvette the Certificate of Title and the Final Bill of Sale).  To be clear, although this statement was false, the Court finds and concludes that Edward did not intend for this statement to be a fraudulent or materially misleading statement to Mr. Radenne.

[107] D-27, DM000028 (emphasis added); R-78, RADENNE 000131 (emphasis added).

deliver what I purchased and what was promised by our company has
eroded due to your inability to provide a weekly update as promised by Alan
and yourself, along with pictures and lack of communication/response to
my ongoing and increasing concerns, etc.[108]

Mr. Radenne also requested Edward to provide (i) weekly updates (with pictures as proof),
and (ii) proof of the court order curing the discrepancy between the Final Bill of Sale, the Title,
and the VIN by October 31, 2019.[109]  Mr. Radenne then sent a follow-up email on October 31,
2019, stating "I am expecting the proof of court order for today."[110]

On October 31, 2019, Edward sent an email to Mr. Radenne stating "I have attached the
court order.  Next is the inspection."[111]  But the court order Edward attached to the email was the
*Corrected Order*[112] issued in 2012 by the County Court of Brown County, Texas—not an updated
court order assigning a new VIN for the 1968 Corvette and curing the discrepancy between the
vehicle, the Final Bill of Sale, and the Certificate of Title.  The credible evidence established that
Duntov would not have been able to obtain the new court order until after the 1968 Corvette was
complete and running—which had not yet occurred.  Ultimately, the Defendants never did get the
1968 Corvette inspected or obtain a court order assigning a new VIN to the 1968 Corvette and
curing the discrepancy relating to the Final Bill of Sale and Certificate of Title.

Even though Edward stated in his October 21, 2019, email that "I think we will have it
ready to ship in 6 weeks or less"[113]—which would have been by December 2, 2019, there is no
evidence in the record of any communications between the parties until December 26, 2019.  On
December 26, 2019, Edward sent an email to Mr. Radenne stating, "I texted you pictures of the

---

[108] R-78, RADENNE 000130.
[109] R-3, DM000018; D-27, pg. DM000018.
[110] R-3, DM000016; D-27, pg. DM000016.
[111] R-78, RADENNE 000127.
[112] R-78, RADENNE 000135–136.
[113] D-27, DM000028 (emphasis added); R-78, RADENNE 000131 (emphasis added).

final dash installation. I know you had said that weather was a consideration for shipping this car. Can I please get an update on that? We still have the windows to fabricate but other that (sic) we are really close."[114]  There is no evidence in the record to suggest that Mr. Radenne responded to Edward's December 26, 2019, email.

### 5. *Mr. Radenne retains counsel and sends a demand letter to the Defendants*

Mr. Radenne retained counsel, and on December 31, 2019, Mr. Radenne's counsel sent a demand letter to the Defendants.  The demand letter required, in part, (i) "specific performance and delivery to Mr. Radenne of the Corvette (legally bearing the VIN identified in the Bill of Sale on both its body and chassis—and affixed by the manufacturer not a third party) 'complete and street legal with a state inspection sticker, license plate, roll cage, race prepared chassis, in primer, with a spare set of wheels'" and (ii) that the Defendants "provide on or before January 17, 2020, copies of the formal, fully executed title to the Corvette and the appropriately and legally issued registration certificate for the Corvette, both in Mr. Radenne's name, along with a copy of the shipping manifest indicating the documents have been examined and approved for export with delivery to Mr. Radenne in France."[115]

The uncontroverted evidence suggested that Duntov completed the 1968 Corvette on or around January 9, 2020.[116]

Following receipt of Mr. Radenne's demand letter, the Defendants retained counsel who then, on January 17, 2020, sent a reply letter to counsel for Mr. Radenne.[117]  The Defendants' reply

---

[114] D-27, DM000016; R-3, DM000016.
[115] D-12.
[116] Testimony of Mr. Alan Sevadjian, ECF No. 221 at pg. 173, line 23 through pg. 174, line 1; testimony of Mr. Edward Sevadjian, ECF No. 218, pg. 188, lines 6–18.
[117] D-20.

stated that they intended to file an action within a week "to remedy the incorrect assignment" of the VIN.

### 6. *The litigation begins*

On January 23, 2020, Alan filed a lawsuit against the Texas Department of Motor Vehicles (the "***TDMV***") in the 14th Judicial District Court of Texas (the "***TDMV State Court Lawsuit***") to begin the process to obtain the court order to remedy the discrepancy between the Final Bill of Sale, Certificate of Title, and the VIN.[118]

On January 29, 2020, Mr. Radenne filed a lawsuit against the Defendants in the 162nd Judicial District Court of Texas (the "***Radenne State Court Lawsuit***")[119] asserting several causes of action against the Defendants. The Defendants responded asserting several affirmative defenses and counterclaims against Mr. Radenne.

On March 26, 2020, Mr. Cooley intervened in the TDMV State Court Lawsuit asserting that he was the owner of the 1968 Corvette.[120] Each of the Defendants answered Mr. Cooley's intervention and asserted several affirmative defenses.[121] In addition, Alan filed a counterclaim against Mr. Cooley.[122]

On April 20, 2020, the State Court in the TDMV State Court Lawsuit entered an *Order Granting Motion to Transfer and Consolidate*[123] consolidating the Radenne State Court Lawsuit into the TDMV State Court Lawsuit (together, the "***Consolidated State Court Lawsuit***").

---

[118] ECF No. 4-2.
[119] *See* ECF No. 4-10, pg. 2, ¶ 3. Note that at this date, while the 1968 Corvette had been completed, the other requirements had not been fulfilled. Namely, the requirement pursuant to the Demand Letter that the Defendants "provide on or before January 17, 2020, copies of the formal, fully executed title to the Corvette and the appropriately and legally issued registration certificate for the Corvette, both in Mr. Radenne's name, along with a copy of the shipping manifest indicating the documents have been examined and approved for export with deliver (sic) to Mr. Radenne in France."
[120] ECF No. 4-8.
[121] ECF No. 195.
[122] ECF No. 4-18.
[123] ECF No. 4-15.

On February 20, 2021, Duntov filed its *Voluntary Petition*[124] commencing the above-referenced Chapter 11 Bankruptcy Case.

On May 17, 2021, Duntov filed its *Notice of Removal*[125] removing the Consolidated State Court Lawsuit to this Court initiating the above-referenced Adversary Proceeding.

On October 20, 2022, Alan and the TDMV filed a *Stipulation of Dismissal as to Defendant Texas Department of Motor Vehicles* dismissing Defendant TDMV from the litigation.[126]

On January 17, 2023, the Court entered the *Joint Pretrial Order*,[127] which superseded the parties' live pleadings previously filed in the Consolidated State Court Lawsuit, and, after its removal to this Court, the litigation is presently before this Court.[128]

### F.    During litigation, it was discovered that the Duntov Frame was actually manufactured in 1978, as opposed to 1968

After this litigation was filed, it was discovered that the Duntov Frame was not manufactured in 1968, but rather, the Duntov Frame was manufactured by General Motors in 1978. The credible evidence established that from 2007—when Mr. Hanna acquired the Hanna Frame—until sometime after the litigation between Mr. Radenne and the Defendants was filed, Mr. Hanna and the Defendants reasonably believed that the Duntov Frame was manufactured by General Motors in 1968.  Evidence in support of this conclusion includes, but is not limited to, the credible testimony of Alan and Edward and the orders entered in 2012 by the Brown County Court. Additionally, as previously noted, each digit of a VIN has specific meaning, and the 6th digit of the

---

[124] Bankr. ECF No. 1.
[125] ECF No. 1.
[126] ECF No. 154.
[127] ECF No. 190.
[128] *See Elvis Presley Enters. v. Capece, et al.*, 141 F.3d 188, 206 (5th Cir. 1998) ("[i]t is a well-settled rule that a joint pretrial order signed by [the] parties supersedes all pleadings and governs the issues and evidence to be presented at trial. . . . Once the pretrial order is entered, it controls the course and scope of the proceedings under Federal Rule of Civil Procedure 16(e), and if a claim or issue is omitted from the order, it is waived, even if it appeared in the complaint.").

VIN was an "8," which indicates the year that the General Motor vehicle was manufactured. Consequently, it was reasonable for Mr. Hanna to believe the Hanna Frame was a "1968 Corvette Convertible Body" when it was represented to be a 1968 frame when Mr. Hanna purchased it from Mr. Scott. Likewise, it was reasonable for the Brown County Court and the Defendants to also assume the Duntov Frame was manufactured in 1968 as opposed to 1978.[129]

After this litigation was filed, however, it was discovered that the Duntov Frame could not have been manufactured in 1968 because it has two indentations in the last rail on the end of the frame. General Motors did not manufacture Corvette frames with those two indentations in the last rail until 1978 through 1982.[130] Consequently, Mr. Radenne and the Defendants concede that the Duntov Frame could not have been manufactured in 1968, but rather, the Duntov Frame could only have been manufactured between 1978–1982.[131] Because the 6th digit of the original VIN obtained by Mr. Hanna is the number "8," the parties (and the Court) reasonably conclude that the Duntov Frame was manufactured by General Motors in 1978 as opposed to 1968.

## G.     Who is Mr. Cooley and Why did he Intervene into this Litigation?

It was not until after Mr. Radenne and the Defendants found themselves in litigation, that they picked up an unexpected passenger—Mr. Cooley—who intervened in the litigation. Mr. Cooley had no relationship with either Mr. Radenne or the Defendants. Rather, Mr. Cooley's story and relationship to the litigation began in 1975 when he purchased a restored 1968 Corvette coupe,

---

[129] Testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 49, line 12 through pg. 50, line 3.

[130] Testimony of Mr. Mackay at ECF No. 211, pg. 22, line 14 through pg. 23, line 1; pg. 29 lines 10–18; pg. 72 lines 16–18; pg. 92, lines 11–16. *See also* testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 49, line 12 through pg. 50, line 3; *see also* D-18 (expert opinion of Mr. Geatches—the Duntov Frame "appears to be a frame of a 1978 Corvette").

[131] Testimony of Mr. Mackay at ECF No. 211, pg. 72 lines 16–18; pg. 92, lines 11–16; *see also* D-18; *see also* testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 152, line 13 through pg. 153 line 7. Mr. Alan Sevadjian testified further, however, that this frame could only have been manufactured either in 1978 or 1979, as opposed to 1978 through 1982, but that distinction is not relevant in this litigation. *See* Testimony of Mr. Alan Sevadjian at ECF No. 221, pg. 152, line 13 through pg. 153 line 7.

VIN 194**378**S422741(the "**Cooley Vehicle**").[132]   The previous owner of the Cooley Vehicle had totaled the vehicle, and after it had been fully restored, Mr. Cooley purchased the Cooley Vehicle on or about December 22, 1975, for $3,000.[133]   Unfortunately in 1980, Mr. Cooley's then girlfriend (and current wife) totaled the Cooley Vehicle.[134]   Mr. Cooley had the inoperable Cooley Vehicle towed to a friend's farm for storage.[135]   Months later in 1981, the Cooley Vehicle was stolen from his friend's farm and the Cooley Vehicle has not been recovered since.[136]

Mr. Cooley contends and testified that the 1968 Corvette is his stolen coupe, the Cooley Vehicle.   During his testimony, however, Mr. Cooley reluctantly conceded that the VIN of his stolen coupe Cooley Vehicle does not match exactly the VIN of the Duntov Frame—the 4th digit of the Cooley Vehicle VIN is a "3" (which indicates that the vehicle was a coupe), whereas the 4th digit of the Duntov Frame was a "6" (which indicates that the vehicle was a convertible).   Mr. Cooley testified further that the discrepancy in the two VINs is the result of a fraudulent alteration of the Duntov Frame's VIN.[137]   But there is no credible evidence in the record to support Mr. Cooley's fraud contention.

Rather, the credible and indisputable evidence contradicts Mr. Cooley's contention that the Duntov Frame or any part of the 1968 Corvette came from the Cooley Vehicle.   First, the VIN of the Cooley Vehicle does not match the VIN of the Duntov Frame.[138]   Second, and even more compelling, the credible evidence confirmed that the Duntov Frame was not even in existence in

---

[132] R-72 (emphasis added).
[133] Testimony of Mr. Cooley 2:03:33 through 2:04:18.
[134] Testimony of Mr. Cooley 2:05:30 through 2:08:55.
[135] Testimony of Mr. Cooley 2:05:30 through 2:08:55.
[136] Testimony of Mr. Cooley 1:59:54 through 2:00:15.
[137] Testimony of Mr. Cooley 2:15:33 through 2:15:45.
[138] The credible evidence established that the VIN of the Cooley Vehicle does not match the VIN of the Duntov Frame.  Although each VIN is very close, they do not match exactually.  Being close may count when it comes to playing horseshoes or tossing hand grenades, but close does not cut it when it comes to vehicle identification numbers.

1975 when Mr. Cooley acquired the Cooley Vehicle—so it is impossible that the Duntov Frame was part of the Cooley Vehicle.[139]  Third, Mr. Cooley could not identify one part of the Duntov Frame or one part from the finished 1968 Corvette that came from the Cooley Vehicle.  Finally, the Cooley Vehicle was a coupe, but the credible evidence established that the Hanna Frame was a "1968 Corvette Convertible Body."[140]  Yet, Mr. Cooley testified and continued to assert that he is entitled to the $85,000 proceeds realized from the sale of the 1968 Corvette and recovery of his attorneys' fees in the approximate amount of $25,000, contending that the 1968 Corvette somehow originated from his Cooley Vehicle.[141]

The Court finds and concludes that Mr. Cooley's factual contentions and legal positions are frivolous and without any merit.  Viewing the evidence in the best possible light for Mr. Cooley, he *might* have had a reasonable suspicion that the 1968 Corvette might possibly have originated from the Cooley Vehicle.  But, at some point during the litigation, when it became clear and beyond any reasonable doubt that the 1968 Corvette could not possibly have had any of its origins from the Cooley Vehicle, Mr. Cooley should have requested to exit this litigation.  Mr. Cooley, however, chose to continue prosecuting his frivolous claims through the conclusion of trial.

## H.     Analysis of Expert Testimony

### 1.  *Mr. Kevin J. Mackay—Mr. Radenne's Expert*

Mr. Radenne engaged Mr. Mackay to provide expert testimony in support of Mr. Radenne's claims and causes of action.  The Court found that much of Mr. Mackay's testimony and opinions were not relevant or credible for three independent reasons.  First, Mr. Mackay's testimony focused

---

[139] The credible evidence established that the Duntov Frame could not possibly have come from the Cooley Vehicle; unless, of course, Mr. Cooley had the ability to join Marty McFly and Dr. Emmett L. Brown in their DeLorean time travel vehicle and head *Back to the Future* to get the Duntov Frame.
[140] R-44, pg. DM000590 and D-2, pg. DM000590.
[141] Testimony of Mr. Cooley 2:21:45 through 2:23:03.

on *restored* classic Corvettes, but the contract between Mr. Radenne and Duntov concerns a "parts car" to be modified as a race car.  Mr. Radenne's counsel admitted that Mr. Mackay was not being offered "as an expert in restoration because this is not a case about restoration."[142]

Second, Mr. Mackay's opinion in his testimony and in his expert report[143] that the 1968 Corvette was the Cooley Vehicle was fatally flawed.  As previously noted, Mr. Cooley acquired his Vehicle in 1975.  Yet, the 1968 Corvette that is the subject of this litigation originated with the Duntov Frame—which Mr. Mackay testified was not manufactured until 1978 (at the earliest), which was three years *after* Mr. Cooley acquired his vehicle.  Accordingly, it is not possible that the Duntov Frame came from the Cooley Vehicle.

Finally, Mr. Mackay testified that the 4th digit of the VIN could not be a "6" if the 1968 Corvette was, in fact, manufactured in 1968 because General Motors did not manufacture a convertible in 1968.  Therefore, the 4th digit of a VIN for a Corvette manufactured could only be a "3" which represents a coupe.  The credible evidence suggested, however, that the Duntov Frame was a convertible frame manufactured in 1978.

To be clear, Mr. Mackay is a well-recognized expert in the field of *restored* classic Corvettes.  But this case is not about a restored classic Corvette.  For all the reasons above, the testimony of Mr. Mackay was not persuasive or impactful in the Court's analysis.

### 2.  Mr. Stephen Curt Geatches—the Defendants' Expert

The Defendants engaged Mr. Geatches to provide expert testimony in support of their claims and defenses in this litigation.  The Court found that the testimony of Mr. Geatches was not persuasive or impactful.  The primary opinions of Mr. Geatches were that the 1968 Corvette constituted a "parts car" that "is a C3 era Corvette which has been substantially modified into a

---

[142] ECF No. 210 at pg. 23, lines 12–17.
[143] R-113.

racecar" and "the racecar vehicle and components of the racecar-vehicle appear to be authentic and in good condition."[144]   Those opinions, are not in dispute—the 1968 Corvette is a "parts car" that Mr. Radenne wished, in part, to drive as a race car.   Therefore, the testimony of Mr. Geatches was not influential in the Court's analysis.

### III.   ANALYSIS OF CLAIMS AND CAUSES OF ACTION

**A.   Mr. Radenne's Claims and Causes of Action Against the Defendants**

In the *Joint Pretrial Order*,[145] Mr. Radenne asserts the following 11 claims and causes of action against the Defendants: (i) breach of contract against Duntov; (ii) breach of implied warranties against all Defendants; (iii) breach of express warranties against all Defendants; (iv) violation of the Texas Deceptive Trade Practices act ("DTPA")[146] against all Defendants; (v) common law fraud against all Defendants; (vi) negligent misrepresentation against all Defendants; (vii) UCC remedies against Duntov; (viii) money had and received against all Defendants; (ix) alter ego against all Defendants; (x) determination of nondischargeability under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) against Duntov; and (xi) attorneys' fees.

The Defendants deny each of Mr. Radenne's claims and assert at least 16 different affirmative defenses to the various claims.

The Court will address each of Mr. Radenne's claims and causes of action, in turn.

#### 1.   *Breach of Contract (against Duntov)*

Mr. Radenne asserts a breach of contract claim against Duntov.[147]   Under Texas law, to prevail on a breach of contract claim, Mr. Radenne has the burden to establish (a) a valid contract

---

[144] D-18.
[145] ECF No. 190.
[146] TEX. BUS. & COMM. CODE § 17.01, *et seq.*
[147] ECF No. 190, pg. 2, ¶ 1.A.; pg. 22, ¶ 8.A; pg. 23, ¶¶ 8.B., D., E., and G.; *see also* ECF No. 160, pg. 8, ¶¶ 5, 7; *see also* ECF No. 164; ECF No. 224; TEX. BUS. & COM. CODE §§ 2.101, 2.103, 2.105, 2.106, 2.301; 2.309.

existed between Mr. Radenne and Duntov; (b) Mr. Radenne tendered performance or was excused from performing; (c) Duntov breached the terms of the contract; and (d) Mr. Radenne sustained damages caused by Duntov's breach.[148]

### a.   The final bill of sale is a valid contract

Mr. Radenne and Duntov do not dispute that the Final Bill of Sale constitutes a valid contract;[149] therefore, the first element for the breach of contract claim is satisfied.  To the extent either party disputed that the Final Bill of Sale was a valid contract, based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that the Final Bill of Sale constitutes the valid contract between Mr. Radenne and Duntov.

### b.   Mr. Radenne tendered performance and was later excused for further performance

Mr. Radenne next contends that he tendered performance under the Final Bill of Sale by timely making $94,553.92 in progress payments that had been invoiced by Duntov.[150]  The fact that Mr. Radenne made such progress payments is not contested.  But Duntov disputes that Mr. Radenne tendered full performance or that he was excused from tendering full performance under the Final Bill of Sale.  The Court disagrees.  For the reasons detailed *infra* in Section III.A.1.c. and based on the Court's review and analysis of the credible evidence in the record, Duntov materially breached the contract.  Thus, the Court finds and concludes that due to Duntov's breach of the Final Bill of Sale contract, Mr. Radenne was later excused from tendering full performance of his obligations.

---

[148] *Turner v. Ewing*, 625 S.W.3d 510, 518 (Tex. App.—Hous. [14th Dist.] 2020, pet. denied).
[149] ECF No. 190; *see also* ECF No. 224 at pg. 16 ("there was no dispute the Bill of Sale is a contract"); *see also* ECF No. 222 at pg. 7, ¶ 7 ("[t]he vehicle was sold to Plaintiff through a bill of sale with a Texas title to be issued upon completion of the project. This arrangement was entirely appropriate.").
[150] ECF No. 190, pg. 6, ¶ N.

### c. *Duntov Breached the Terms of the Final Bill of Sale*

Mr. Radenne next contends that Duntov breached the terms of the Final Bill of Sale contract. In support of his breach of contract claim, Mr. Radenne asserted several alleged breaches. All but one of Mr. Radenne's alleged breaches, however, fail and are not supported by the credible evidence in the record. For example, Mr. Radenne contends that "[t]he Contract obligated Duntov to convey a 1968 Corvette Chevrolet Corvette bearing the factory issued VIN of 194678S422741 to Plaintiff,"[151] and "Duntov breached the Contract by failing to tender or convey the 1968 Corvette "with factory-inscribed S-VIN on the chassis."[152] As detailed in this Memorandum Opinion, there is no term, provision, or obligation in the Final Bill of Sale contract requiring Duntov to convey the 1968 Corvette with a "factory issued" or "factory-inscribed" VIN of 194678S422741 on the 1968 Corvette. Consequently, Mr. Radenne's claim of a breach of contract based on these contentions fails.

Mr. Radenne also contends that Duntov failed to timely tender, convey, or deliver the conforming 1968 Corvette required by the Final Bill of Sale contract.[153] The Court agrees. Although the Final Bill of Sale does not set a specific deadline to complete the project, Texas law provides that "[t]he time for shipment or delivery or any other action under a contract if not provided in this chapter or agreed upon shall be a reasonable time."[154] Based on the following analysis, the Court finds and concludes that Duntov failed to timely complete the project resulting in a breach of contract by Duntov.[155]

---

[151] ECF No. 190 at pg. 23 at ¶¶ B. and C.
[152] ECF No. 190 at pg. 23 at ¶ E.; *See also* ECF No. 190 at 9, ¶ I.c.
[153] ECF No. 190 at pg. 23 at ¶ E. (limited to the contention "Duntov breached the Contract by failing to tender or convey the 1968 Chevrolet Corvette . . . to Plaintiff."); ECF No. 224 at pgs. 8–9; 10–11; and 17–18.
[154] TEX. BUS. & COM. CODE § 2.309(a).
[155] In addition, the year and a half plus that it took Duntov to complete the vehicle was both untimely and unreasonable.

The *Terms and Conditions* section of the Final Bill of Sale includes the following representation by Duntov: "[w]e will make every effort to complete the car and have it registered and race ready for the event at Circuit of the Americas, November 1-4, 2018."[156]  To meet this timeline, however, Duntov would have had to complete building the 1968 Corvette in approximately five months from the date of the Final Bill of Sale.  A timeline of five months appears unrealistically aggressive, given Alan's initial representation to Mr. Radenne on May 2, 2018, that "[b]uilding a car from scratch typically takes us between 1000 and 1500 hours, depending on the car."[157]  That timeline equates to six to nine months assuming one worker spending 40 hours each and every week to complete the project.

From June 2018 through November 2018, Mr. Radenne and the Defendants maintained good communication and the project "was progressing quite well."[158]  Mr. Radenne testified that in November 2018, however, he "started to have less and less feedback from Alan."[159]  Therefore, around that time, Mr. Radenne decided to travel to the United States to inspect the car and the progress being made on the project.[160]  Mr. Radenne traveled to the United States in early February 2019 to inspect the vehicle and the status of the project.

After returning to France, Mr. Radenne sent Alan a couple of emails expressing his disappointment in "the stage of construction of the car," and he also stated "[a]s I explained to Edward, *I will need to get the car in not too long*. Taking into account the time necessary for shipment, receiving, preparation for inspection, submission, and most certainly the necessary adjustment. I have still a chance to race one by the end of the season."[161]  This email was the first

---

[156] D-6, pg. DM000008.
[157] R-43, pg. DM000439.
[158] Testimony of Mr. Radenne, ECF No. 220 at pg. 74, line 16.
[159] Testimony of Mr. Radenne, ECF No. 220 at pg. 74, lines 16–19.
[160] Testimony of Mr. Radenne, ECF No. 220 at pg. 74, line 23 through pg. 75, line 3.
[161] D-9, pg. DM000081 (emphasis added).

time Mr. Radenne raised a concern about the time-period within which the Defendants would need to reasonably complete the project.

In March of 2019, Mr. Radenne again expressed concerns over the delays in the project. On March 13, 2019, Mr. Radenne sent an email to Edward further expressing "[a]ll I need is to have an idea about what's going on with the work on my car time to time, and to understand when I can organize the transfer to Europe."[162]  At this time, the project to build the 1968 Corvette was already in its ninth month.

Between March 2019 through August 2019, the record suggests that not much progress was made on the project.  Because of the apparent lack of meaningful progress, Mr. Radenne sent his August 21, 2019, email to Edward insisting on a firm deadline to finish the project "especially since it has been initiated a bit more that 1 year ago."[163]  This email was the first time Mr. Radenne insisted on establishing a firm deadline for the Defendants to complete the project.[164]

Becoming more frustrated with Duntov's lack of progress, Mr. Radenne sent Edward his October 15, 2019, email affirmatively setting deadlines for Duntov to (i) obtain the court order relating to the VIN issue by October 19, 2019, and (ii) completing and shipping the 1968 Corvette by "mid-February at the latest."[165]  Mr. Radenne stated further that "[n]ow that you know what is the ultimate deadline," . . . if Duntov cannot "finalize this project within these timelines (which is **already** about 10 months late vs. the original plan), I will give up this project and request my investment back."[166]  Receiving no response from the Defendants, Mr. Radenne sent Alan and

---

[162] R-17, pg. DM000053.
[163] D-27, DM000035; *see also* testimony of Mr. Radenne, ECF No. 220 at pg. 141, line 22 through pg. 142, line 8.
[164] Testimony of Mr. Radenne, ECF No. 220 at pg. 165, lines 16–24.
[165] R-9, pg. DM000034.
[166] R-9, pg. DM000034.

Edward a follow-up email on October 21, 2019, summarizing the timeline of the events over the previous 16 months and demanding a refund by October 31, 2019.[167]

Later that day, Edward responded to Mr. Radenne representing that the court order had been "secured"[168] and that "I think we will have it ready to ship in 6 weeks or less."  Mr. Radenne replied to Edward's email accepting Duntov's proposed six-week deadline, stating "Duntov Motor has communicated . . . for the next '6 weeks' as this is the period you consider necessary for completion."[169]  Therefore, six weeks from the date of Edward's email established December 2, 2019, as the deadline to complete the project.  Additionally, Mr. Radenne agreed to extend the deadline for Duntov to obtain the court order addressing the VIN issue to October 31, 2019.[170]

Mr. Radenne then sent a follow-up email on October 31, 2019, stating "I am expecting the proof of court order for today."[171]  Duntov, however, failed to obtain the court order by the October 31, 2019.[172]  Additionally, although Duntov represented that the vehicle would be "ready to ship in 6 weeks or less"[173]—which would have been by December 2, 2019—Duntov failed to complete the 1968 Corvette by that deadline.  Consequently, Duntov breached both affirmative deadlines set by Mr. Radenne, which this Court finds and concludes to be reasonable deadlines to complete the Final Bill of Sale contract.

Mr. Radenne retained counsel, and on December 31, 2019, Mr. Radenne's counsel sent a demand letter to the Defendants.  The demand letter required, in part, (i) "specific performance and delivery to Mr. Radenne of the Corvette (legally bearing the VIN identified in the Bill of Sale

---

[167] R-3, pgs. DM000019–020.
[168] *See* footnote # 106.
[169] R-3, pg. DM000018.
[170] R-3, pg. DM000018.
[171] R-3, DM000016.
[172] The record established that the Defendants never did obtain a court order assigning a new VIN to the 1968 Corvette curing the discrepancy relating to the Final Bill of Sale and Certificate of Title.
[173] D-27, DM000028 (emphasis added); R-78, RADENNE 000131 (emphasis added).

on both its body and chassis—and affixed by the manufacturer not a third party) 'complete and street legal with a state inspection sticker, license plate, roll cage, race prepared chassis, in primer, with a spare set of wheels'," and (ii) that the Defendants "provide on or before January 17, 2020, copies of the formal, fully executed title to the Corvette and the appropriately and legally issued registration certificate for the Corvette, both in Mr. Radenne's name, along with a copy of the shipping manifest indicating the documents have been examined and approved for export with deliver to Mr. Radenne in France."[174]

Duntov, however, did not cure the defaults raised in Mr. Radenne's demand letter. Rather, the Defendants retained counsel who then, on January 17, 2020, sent a reply letter to counsel for Mr. Radenne.[175] The Defendants' reply stated that they intended to file an action within a week "to remedy the incorrect assignment" of the VIN.

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne has satisfied his burden to establish that Duntov breached the terms of the Final Bill of Sale contract by failing to timely (i) obtain the court order relating to the VIN issue; and (ii) complete and ship the 1968 Corvette.

### d. Mr. Radenne sustained damages caused by Duntov's breach

The uncontroverted and undisputed evidence established that Duntov sent Mr. Radenne invoices pursuant to the Final Bill of Sale totaling $94,553.92, of which, Mr. Radenne timely paid.[176] Additionally, Mr. Radenne sent parts for the project to Duntov totaling an additional $1,250.77.[177] Based on the Court's review and analysis of the credible evidence in the record, the

---

[174] D-12.
[175] D-20.
[176] ECF No. 190, pg. 6 at ¶ N.
[177] R-34 and R-35; ECF No. 220, pg. 108, lines 13–19; ECF No. 224, pg. 6.

Court finds and concludes that Mr. Radenne has satisfied his burden to establish that he sustained damages caused by Duntov's breach in the amount of $95,780.35.

Therefore, Mr. Radenne's claim of Breach of Contract against Duntov is **GRANTED**, and Mr. Radenne is entitled to Judgment against Duntov for general damages in the amount **$95,780.35**.

### 2.  *Breach of Implied Warranties (against Duntov)*

Mr. Radenne contends that Duntov breached implied warranties of title, merchantability, and fitness for a particular purpose.[178]  In support of his breach of implied warranty count against Duntov, Mr. Radenne contends that the Final Bill of Sale "obligated Duntov to convey a 1968 Chevrolet Corvette *bearing the factory issued VIN* of 194678S422741 to [Mr. Radenne] with *implied* and express warranties of title"[179] and "Defendants' identification of the subject vehicle as a 1968 Chevrolet-manufactured Corvette *with a factory-inscribed VIN* on the chassis formed the basis of the parties' bargain."[180]  The Court disagrees.

Nowhere in the Final Bill of Sale or in any of the many communications between Mr. Radenne and the Defendants was there a requirement that the custom 1968 Corvette parts car to be built by Duntov required a "factory issued" or "factory-inscribed" VIN on the chassis.  Rather, the agreement between Mr. Radenne and the Defendants was that Duntov was required to deliver a custom-built 1968 Corvette and that the VIN on the vehicle match the VIN on the Certificate of Title and the Final Bill of Sale.  The credible evidence in the record established that Mr. Radenne knew that the Defendants would have to obtain a court order to cure the VIN discrepancy.  Mr. Radenne's testimony that he expected and required the completed 1968 Corvette parts car to

---

[178] ECF No. 190, pg. 2, ¶ 1.A.; pg. 23, ¶¶ 8.B.; 8.F.; pg. 24, ¶ 8.K.; *see also* ECF No. 160, pg. 8, ¶¶ 2, 6, 11; *see also* ECF No. 224; TEX. BUS. & COM. CODE §§ 2.312(a); 2.314(b)(1), and 2.315.

[179] ECF No. 190, pg. 23, ¶ 8.B; *see also* ECF No. 160 pg. 8, ¶ 2 (emphasis added); *see also* ECF No. 224.

[180] ECF No. 190, pg. 23, ¶ 8.C; *see also* ECF No. 160 pg. 8, ¶ 3 (emphasis added); *see also* ECF No. 224.

include "a factory issued" or a "factory-inscribed" VIN on either the Duntov Frame or its chassis

was not credible and contrary to the substantial evidence in the record.

Second, Texas law permits a seller to disclaim implied warranties of merchantability or

fitness for any particular purpose if the disclaimer is in writing, mentions the word

"merchantability," and is conspicuous.[181]  "When a reasonable person against whom a clause is to

operate ought to have noticed it, the clause is conspicuous.  For example, language in capital

headings, language in contrasting type or color, and language in an extremely short document,

such as a telegram, is conspicuous."[182]

The Final Bill of Sale contains the following disclaimer:

> **Warranty:**
> Buyer acknowledges **THERE IS NO WARRANTY ON THE VEHICLE, and the SELLER EXPRESSLY DISCLAIMS ALL WARRANTIES EITHER EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.**[183]

The disclaimer is conspicuous, contains the word "merchantability," and expressly

disclaims implied warranties of merchantability or fitness for any particular purpose.  Therefore,

the disclaimer contained in the Final Bill of Sale is enforceable.

Based on the Court's review and analysis of the credible evidence in the record, the Court

finds and concludes that Mr. Radenne failed to offer adequate credible evidence to satisfy his

burden to establish that Duntov breached an implied warranty of title, merchantability, or fitness

---

[181] TEX. BUS. & COMM. CODE § 2.316.
[182] *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 511 (Tex. 1993).
[183] Def. Ex. 6, RADENNE 000125.

for a particular purpose. Therefore, Mr. Radenne's claim of breach of implied warranties against Duntov is ***DENIED*** and ***DISMISSED***.

### 3. Breach of Express Warranties (against all Defendants)

Mr. Radenne contends that each of the Defendants also breached an express warranty of title and express warranties by affirmation, promise, description, or sample.[184] To prevail on a breach of express warranty claim, Mr. Radenne has the burden to establish (i) the Defendants made a representation to Mr. Radenne about the title, quality, or characteristics of the 1968 Corvette; (ii) the Defendants made the representation by affirmation of fact, promise, description, or display of a sample or model; (iii) the representation became part of the "basis of the bargain;" (iv) the 1968 Corvette did not comply with the representation; and (v) Mr. Radenne suffered injury.[185] "Basis of the bargain" is akin to reliance.[186]

In support of his breach of express warranty count against each of the Defendants, Mr. Radenne again contends that the Final Bill of Sale "obligated Duntov to convey a 1968 Chevrolet Corvette *bearing the factory issued VIN* of 194678S422741 to [Mr. Radenne] with implied and *express* warranties of title"[187] and "Defendants' identification of the subject vehicle as a 1968 Chevrolet-manufactured Corvette *with a factory-inscribed VIN* on the chassis formed the basis of the parties' bargain."[188] Again, the Court disagrees and incorporates its reasons detailed *supra* in Section III.A.2. of this Memorandum Opinion.

Additionally, Duntov's express warranty in the Final Bill of Sale stated that it would deliver the 1968 Corvette with VIN 194678S422741. There is no evidence in the record to suggest that it

---

[184] ECF No. 190, pg. 2, ¶ 1.A.; pg. 23, ¶¶ 8.B.; 8.F.; pg. 24, ¶ 8.K.; *see also* ECF No. 160, pg. 8, ¶¶ 2, 6, 11; *see also* ECF No. 224; *see also* TEX. BUS. & COM. CODE §§ 2.312(a); and 2.313(a)(1).
[185] TEX. BUS. & COM. CODE § 2.313; *Morris v. Adolph Coors Co.*, 735 S.W.2d 578, 587 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.).
[186] *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997).
[187] ECF No. 190, pg. 23, ¶ 8.B; *see also* ECF No. 160 pg. 8, ¶ 2 (emphasis added); *see also* ECF No. 224.
[188] ECF No. 190, pg. 23, ¶ 8.C.; *see also* ECF No. 160 pg. 8, ¶ 3 (emphasis added); *see also* ECF No. 224.

was not possible for the Defendants to comply with that express warranty. To the contrary, the credible evidence in the record suggests that the Defendants could comply with that express warranty by obtaining a court order assigning VIN 194678S422741 to the 1968 Corvette. Before Duntov could obtain that court order, however, Mr. Radenne cancelled the contract due to Duntov's breach of contract for failing to timely perform.[189] Therefore, since it was possible for Duntov to comply with the express warranty, Mr. Radenne did not satisfy his burden on this claim.

Finally, Mr. Radenne contends that the 1968 Corvette "was not fit for the particular purpose, known, to the seller, for which Mr. Radenne was purchasing it."[190] Again, the Court disagrees. The credible evidence in the record established that Mr. Radenne knew he was purchasing a "parts car" and that the Defendants would need to obtain a court order so the VIN requested by Mr. Radenne would be assigned to the 1968 Corvette and would match the Certificate of Title and Final Bill of Sale. Mr. Radenne's testimony and contention to the contrary was not persuasive. The credible evidence in the record suggests that the Defendants could comply by obtaining a court order assigning VIN 194678S422741 to the 1968 Corvette. Before Duntov could obtain that court order, however, Mr. Radenne cancelled the contract due to Duntov's breach of contract for failing to timely perform.[191] Therefore, since it was possible for Duntov to complete the 1968 Corvette with the VIN 194678S422741, the particular purpose for which Mr. Radenne was purchasing the 1968 could be satisfied. Consequently, Mr. Radenne did not satisfy his burden on this claim.

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne failed to offer adequate credible evidence to satisfy his

---

[189] TEX. BUS. & COM. CODE § 2.106(d).
[190] ECF No. 224 at pg. 11, ¶ C.
[191] TEX. BUS. & COM. CODE § 2.106(d).

burden to establish that any of the Defendants breached an express warranty of title or an express warranty by affirmation, promise, description, or sample. Therefore, Mr. Radenne's claim of breach of express warranties against each of the Defendants is ***DENIED*** and ***DISMISSED***.

### 4. *Violation of the Texas Deceptive Trade Practices Act (against all Defendants)*

Mr. Radenne contends that each of the Defendants violated the Texas Deceptive Trade Practices Act ("**DTPA**").[192] The DTPA is liberally construed "to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions and breaches of warranty and to provide efficient and economical procedures to secure such protection."[193] The DTPA does not codify the common law, but it functions to allow consumers to pursue causes of actions for deceptive trade practices without the burden of proof and the plethora of defenses as available in common law fraud or breach of contract or warranty.[194]

To succeed under a DTPA claim against the Defendants, Mr. Radenne must establish that (i) he was a consumer; (ii) the Defendants can be sued under the DTPA; (iii) the Defendants (a) committed at least one wrongful act that § 17.46(b) of the Texas Business & Commerce Code enumerates, (b) breached an express or implied warranty, or (c) engaged in an unconscionable action; and (iv) the Defendants' actions were a producing cause of Mr. Radenne's damages.[195] Further, Mr. Radenne may recover mental anguish damages and treble damages *if* the Defendant knowingly or intentionally violated the DTPA.[196]

---

[192] ECF No. 190, pg. 2, ¶ 1.A.; pg. 23, ¶¶ 8.H.; 8.I.; pg. 25, ¶ 8.S.; *see also* ECF No. 160, pg. 8, ¶¶ 8, 9; *see also* TEX. BUS. & COMM. CODE § 17.01, *et seq.*
[193] *Smith v. Baldwin*, 611 S.W.2d 611, 614 (Tex. 1980).
[194] *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 825 (Tex. 2012).
[195] TEX. BUS. & COM. CODE §§ 17.41–17.63; *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996).
[196] TEX. BUS. & COM. CODE § 17.50(b)(1).

To state a DTPA claim specifically in this case, the Defendants must have failed to disclose "material information" that the Defendants knew at the formation of the agreement and never brought that particular "material information" to Mr. Radenne's attention.[197]  "Under section 17.46(b)(23) of the DTPA, information *known at the time of the transaction* must be withheld for the purpose of inducing the consumer into a transaction which the consumer would not have entered had the information been disclosed.  Furthermore, the information withheld must concern goods or services."[198]  Finally, Mr. Radenne must establish that he relied to his detriment on the deceptive act.[199]

While there is not an exhaustive list of "false, misleading, or deceptive acts or practices" contained in Section 17.46(b), the statute does provide 30 examples of such "false, misleading, or deceptive acts or practices."[200]  Mr. Radenne specifically contends that Defendants passed off goods or services as those of another,[201] caused confusion or misunderstanding as to the source or certification of the vehicle,[202] misrepresented characteristics of the goods or services,[203] misrepresented the quality and particular style or model of the goods,[204] advertised goods with the intent to not sell them as advertised,[205] advertised goods with the intent not to supply a reasonable expectable public demand,[206] represented that title conveyed rights or remedies which it does not have,[207] represented that a guaranty or warranty has rights that it does not have,[208] represented that

---

[197] *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 479 (Tex. 1995).
[198] *Id.*
[199] *Cruz*, 364 S.W.3d at 823.
[200] TEX. BUS. & COM. CODE § 17.46(b).
[201] TEX. BUS. & COM. CODE § 17.46(b)(1); *see also* ECF No. 190, pg. 23. ¶ 8.I.a.
[202] TEX. BUS. & COM. CODE § 17.46(b)(2); *see also* ECF No. 190, pg. 24. ¶ 8.I.b.
[203] TEX. BUS. & COM. CODE § 17.46(b)(3); *see also* ECF No. 190, pg. 24. ¶ 8.I.c.
[204] TEX. BUS. & COM. CODE § 17.46(b)(5); *see also* ECF No. 190, pg. 24. ¶ 8.I.d.
[205] TEX. BUS. & COM. CODE § 17.46(b)(9); *see also* ECF No. 190, pg. 24. ¶ 8.I.e.
[206] TEX. BUS. & COM. CODE § 17.46(b)(10); *see also* ECF No. 190, pg. 24. ¶ 8.I.f.
[207] TEX. BUS. & COM. CODE § 17.46(b)(12); *see also* ECF No. 190, pg. 24. ¶ 8.I.g.
[208] TEX. BUS. & COM. CODE § 17.46(b)(20); *see also* ECF No. 190, pg. 24. ¶ 8.I.h.

work was being performed when in fact it was not,[209] and induced Mr. Radenne into entering the
contract by failing to disclose known information from the beginning.[210]

In response, the Defendants first contend that Mr. Radenne's DTPA claims are barred by
the statute of limitations.[211]  This contention fails on the merits because Mr. Radenne commenced
the Radenne State Court Lawsuit on January 29, 2020, well within the two-year statute of
limitations period contained in the statute.  Even though Mr. Radenne did not initially assert the
DTPA count in his original complaint, the Texas Civil Practice and Remedies Code unequivocally
provides that amended pleadings relate back to the date of the original complaint.[212]  The Fifth
Circuit has held that when a plaintiff amends a complaint filed in Texas state court, the Texas
relation back statute applies.[213]

While Mr. Radenne's DTPA claim was timely, the claim itself lacks merit.  The credible
evidence established that the Defendants did not attempt to sell goods or services that belonged to
someone else—as the Defendants had good title to the Duntov Frame.  The credible evidence
further established that the Defendants accurately represented the characteristics, quality, and
particular style or model of the "parts car" they agreed to build and sell to Mr. Radenne.  Finally,
Mr. Radenne failed to establish, with credible evidence, that the Defendants induced him to enter
into the Final Bill of Sale by failing to disclose relevant and known information at that time.

Based on the Court's review and analysis of the credible evidence in the record and for all
the reasons detailed throughout this Memorandum Opinion, the Court finds and concludes that Mr.
Radenne failed to offer adequate credible evidence to satisfy his burden to establish DTPA liability

---

[209] TEX. BUS. & COM. CODE § 17.46(b)(22); *see also* ECF No. 190, pg. 24. ¶ 8.I.i.
[210] TEX. BUS. & COM. CODE § 17.46(b)(24); *see also* ECF No. 190, pg. 24. ¶ 8.I.j.
[211] TEX. BUS. & COM. CODE § 17.565.
[212] TEX. CIV. PRAC. & REM. CODE § 16.068.
[213] *Taylor v. Bailey Tool Mfg. Co.*, 744 F. 3d 944, 946 (5th Cir. 2014); *see also* FED. R. CIV. P. 15(c).

against any of the Defendants.  Therefore, Mr. Radenne's claim of DTPA liability against each of the Defendants is ***DENIED*** and ***DISMISSED***.

### 5.  *Common Law Fraud (against all Defendants)*

Mr. Radenne contends that each of the Defendants committed common law fraud.[214]  "The traditional elements of common-law fraud are (1) a knowing or reckless material misrepresentation, (2) that the tortfeasor intended to act on, and (3) that harmed the plaintiff."[215] More specifically, the elements of common law fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[216]

Mr. Radenne has the burden of proof to establish that the Defendants made misrepresentations that were material, false, or reckless and that he justifiably relied on the such misrepresentations.[217]  Reliance must be reasonable and justified.[218]  Justifiable reliance depends heavily on the parties' relationship with each other and their respective relative level of sophistication.[219]  "The reliance element does not require a plaintiff to demonstrate reasonableness, yet a person may not justifiably rely on a representation if 'there are red flags indicating such reliance is unwarranted.'"[220]  "The recipient of a fraudulent misrepresentation of fact is justified

---

[214] ECF No. 190, pg. 2, ¶¶ 1.A. and B., pg. 26, ¶ X.; *see also* ECF No. 160, pg. 6, ¶ 18, pg. 11, ¶ 24; ECF No. 224.
[215] *Jarkesy v. Sec. & Exch. Comm'n*, 34 F.4th 446, 455 (5th Cir. 2022), *cert. denied sub nom. Jarkesy v. SEC*, No. 22-991, 2023 WL 4278466 (U.S. June 30, 2023), and *cert. granted sub nom. SEC v. Jarkesy*, No. 22-859, 2023 WL 4278448 (U.S. June 30, 2023) (quoting *In re Deepwater Horizon*, 857 F.3d 246, 249 (5th Cir. 2017)).
[216] *Saenz v. Gomez*, 899 F.3d 384, 391 (5th Cir. 2018) (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).
[217] *Saenz v. Gomez*, 899 F.3d at 392.
[218] *In re Saenz*, 534 B.R. 276, 294 (Bankr. S.D. Tex. 2015), *subsequently aff'd sub nom. Saenz v. Gomez*, 899 F.3d 384 (5th Cir. 2018).
[219] *In re Saenz*, 534 B.R. at 294.
[220] *Id.* (quoting *AT&T Universal Card Serv. Inc. v. Mercer (In re Mercer)*, 246 F.3d 391, 418 (5th Cir. 2001)) (citations omitted).

in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation."[221]

Mr. Radenne first contends that the Defendants made material, false, or reckless misrepresentations concerning the VIN of the Duntov Frame and the VIN applicable to the 1968 Corvette. As detailed in this Memorandum Opinion, there was clear confusion among all the Parties concerning the VIN of the Duntov Frame and the 1968 Corvette. Mr. Radenne explicitly requested that the VIN for the 1968 Corvette contain a "S" in the 7th digit of the VIN. Alan confirmed to Mr. Radenne that the VIN of the completed 1968 Corvette, the Certificate of Title, and the Final Bill of Sale must match.

Although the credible evidence suggests that there was initial confusion about the VIN of the Duntov Frame, it became clear in the following months that a court order would be required to resolve the confusion and discrepancy between the Duntov Frame (which would become part of the custom built 1968 Corvette), the Certificate of Title to be delivered to Mr. Radenne, and the Final Bill of Sale. Mr. Radenne's actions and communications, detailed throughout this Memorandum Opinion, make clear that he ultimately understood the VIN discrepancy and was satisfied with Duntov's ability to cure the VIN discrepancy. Further, there is no evidence in the record to suggest that Duntov would not be able to obtain such a court order. The Court finds and concludes that none of the Defendants made a material, fraudulent, or reckless misrepresentation about the VIN of the Duntov Frame or the ability of Duntov to obtain a court order to cure the VIN discrepancy.

Second, Mr. Radenne contends that the Defendants made material, fraudulent, or reckless misrepresentations to Mr. Radenne that Duntov was the owner of the Duntov Frame. The credible

---

[221] *In re Saenz*, 534 B.R. at 295 (quoting Restatement (Second) of Torts § 540 (1977)).

evidence established that (i) although the Duntov Frame was titled in Alan's name as opposed to Duntov, Duntov was the beneficial and equitable owner of the Duntov Frame, and (ii) Alan could and would transfer legal title of the Duntov Frame to Duntov—enabling Duntov to ultimately transfer title of the completed 1968 Corvette to Mr. Radenne.  Therefore, the Court finds and concludes that the credible evidence established that that the Defendants did not make a material, fraudulent, or reckless misrepresentation about the ownership of the Duntov Frame or Duntov's ability to convey title of the Duntov Frame and the completed 1968 Corvette to Mr. Radenne.

Third, Mr. Radenne contends that the Defendants made a material, fraudulent, or reckless misrepresentation to Mr. Radenne that the Duntov Frame was a 1968 Corvette frame.  The credible evidence in the record clearly established that all the Parties initially believed the Duntov Frame was manufactured by General Motors in 1968.  It was not until after this litigation was filed that the Parties realized that the Duntov Frame was actually manufactured in 1978 as opposed to 1968.[222]  Although this discrepancy may seem to be "material" on first blush, the credible and uncontroverted evidence established that (i) the Defendants believed, in good faith and based on the title Alan received from Mr. Hanna, that the Duntov Frame was a 1968 manufactured frame, and (ii) a 1978 frame on a custom built vintage 1968 Corvette would (a) comply with the FIA requirements to enable the 1968 Corvette to qualify for racing in the FIA European historic racing circuit, and (b) be "street legal" for driving throughout Europe.  Therefore, the Court finds and concludes that the credible evidence established that the Defendants' representation about the year the Duntov Frame was manufactured by General Motors was not material, fraudulent, or reckless.

---

[222] *Supra* Section II.F.

Case 21-04030-mxm    Doc 225    Filed 11/28/23    Entered 11/28/23 11:32:30    Desc Main
Document    Page 54 of 65

Fourth, Mr. Radenne contends that Alan made a false representation to Mr. Radenne in Alan's June 20, 2018, email[223] when he responded, "Yes, confirming both."[224]  This email exchange, however, should not be analyzed and interpreted in isolation.  Rather, this email exchange must be analyzed and considered in context with all the communications that took place between Mr. Radenne and the Defendants to arrive at a proper interpretation and conclusion regarding this email exchange.  Additionally, the Court found Alan's testimony addressing this specific email exchange was credible.[225]

Although there was clear confusion concerning the VIN of the Duntov Frame, when analyzed and considered within all the communications between Mr. Radenne and the Defendants, the VIN confusion was ultimately clarified, and Mr. Radenne accepted that the VIN issue could be cured by Duntov obtaining a court order.  Mr. Radenne forged ahead with the project, giving Duntov the green light to obtain a court order to resolve the VIN discrepancy.  Consequently, Mr. Radenne failed to establish that Alan made a false or reckless misrepresentation to Mr. Radenne in this email exchange.

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne failed to offer adequate credible evidence to satisfy his burden to establish that the Defendants committed common law fraud.  Therefore, Mr. Radenne's claim of common law fraud against each of the Defendants is **DENIED** and **DISMISSED**.

### 6.   *Negligent Misrepresentation (against all Defendants)*

Mr. Radenne contends that each of the Defendants made negligent misrepresentations to Mr. Radenne.[226]  In support of his negligent misrepresentation claim against the Defendants, Mr.

---

[223] D-6, pg. RADENNE 000111; R-77, pg. RADENNE 000111.
[224] R-77.
[225] ECF No. 221, pg. 35, lines 2–20; ECF No. 221, pg. 199, line 18 through pg. 200, line 6.
[226] ECF No. 190, pg. 2, ¶ 1.A.

Radenne contends: (i) "Defendants made representations and failed to disclose facts to [Mr. Radenne] to induce him to purchase a vehicle and hire Defendants to make said vehicle 'road legal' and 'race ready';"[227] (ii) "Defendants supplied false information to [Mr. Radenne] regarding the 'true identity' of the vehicle [Mr. Radenne] purchased;"[228] and (iii) "Defendants also misrepresented the amount of time it would take to have said vehicle 'race ready.'"[229]

To succeed on a negligent misrepresentation claim under Texas law, a plaintiff is required to prove that: (1) without exercising reasonable care or competence in communicating information to plaintiff; (2) defendant supplied "false information" for the guidance of plaintiff; (3) in the ordinary course of business; (4) which caused plaintiff to suffer a pecuniary loss by justifiably relying on the information.[230]  The type of "false information" must be a misstatement of existing fact, not a promise of future conduct.[231]

In Texas, non-disclosures rise to the level of negligence only if there is a corresponding duty to disclose that information.[232]  Under Texas law, a duty to disclose information may arise in the following four situations: "(1) when there is a 'confidential or fiduciary relationship'; (2) 'when one voluntarily discloses information, he has a duty to disclose the whole truth'; (3) 'when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue'; and (4) 'when one makes a partial disclosure and conveys a false impression, he has a duty to speak.'"[233]

---

[227] ECF No. 10, pg. 6, ¶ 76.
[228] ECF No. 10, pg. 6, ¶ 77.
[229] ECF No. 10, pg. 6, ¶ 77.
[230] *Coburn Supply Co. v. Kohler Co.*, 342 F.3d 372, 377 (5th Cir. 2003) (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)).
[231] *Erdman Co. v. USMD of Arlington GP, LLC*, No. 3:09-CV-1081-D, 2011 WL 1356920, at *19 (N.D. Tex. Apr. 11, 2011).
[232] *Coburn Supply Co.*, 342 F.3d at 377 (quoting *Fed. Land Bank*, 825 S.W.2d at 442).
[233] *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, No. CIV.A.3:08CV0102B, 2008 WL 3925272, at *12 (N.D. Tex. Aug. 27, 2008), *aff'd sub nom. Highland Crusader Offshore Partners LP v. LifeCare*

Although the claim is referenced in the Complaint and Joint Pretrial Order, it appears that Mr. Radenne abandoned this claim. Mr. Radenne did not identify any specific representations that Mr. Radenne deemed "negligent" in the Complaint, Pretrial Order, during trial, or in his post-trial brief. To the extent Mr. Radenne contends that the representations referenced in support of his other claims and causes of action were also negligent, based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne failed to offer adequate credible evidence to satisfy his burden to establish each element for a claim of negligent misrepresentation relating to any such alleged negligent representations. Therefore, Mr. Radenne's claim of negligent representation against each of the Defendants is ***DENIED*** and ***DISMISSED***.

### 7.  UCC Remedies (against Duntov)

Mr. Radenne contends that he is entitled to UCC remedies against Duntov.[234]  Under this claim, Mr. Radenne contends that he is entitled to UCC remedies based on Duntov's breach of the Final Bill of Sale contract.[235]  Under the UCC, there are two ways to end a sale of goods agreement: (1) termination or (2) cancellation.[236]  Any party may terminate a contract for a reason other than breach, and both parties are discharged from performing but keep their rights and remedies based on prior performances or breaches.[237]  Cancellation occurs when either party ends the contract due to a breach, and the cancelling party retains rights and remedies for the alleged breach.[238]  Apart from the retention of the remedy of breach, the effects of cancellation are the same as

---

*Holdings Inc.*, 377 F. App'x 422 (5th Cir. 2010) (quoting *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos., Inc.*, 217 S.W.3d 653, 670–71 (Tex.App.-Hous. [14th Dist.] 2006, pet. denied); *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 388 F.Supp.2d 780, 788 (S.D. Tex. 2005)).
[234] ECF No. 190, pg. 2, ¶ 1.A.
[235] ECF No. 10 ¶¶ 82–86.
[236] TEX. BUS. & COM. CODE § 2.106(c)–(d); U.C.C. § 2-106(3)–(4).
[237] TEX. BUS. & COM. CODE § 2.106(c); U.C.C. § 2-106(3).
[238] TEX. BUS. & COM. CODE § 2.106(d); U.C.C. § 2-106(4).

Case 21-04030-mxm   Doc 225   Filed 11/28/23   Entered 11/28/23 11:32:30   Desc Main
Document    Page 57 of 65

termination.[239]  Damages for a breach of contract claim are based on whether the terminating party gave reasonable notice to the other party.[240]

Additionally, under the UCC, either party has the right to request reasonable assurances of performance.  Specifically,

> A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.[241]

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne has satisfied his burden to establish that he is entitled to UCC remedies against Duntov, for the reasons more fully addressed *supra* in Section III.A.1. of this Memorandum Opinion.  Therefore, Mr. Radenne's claim of UCC remedies against Duntov is **GRANTED**, and Mr. Radenne is entitled to Judgment against Duntov for general damages in the amount of ***$95,780.35.***

### 8.  *Money had and Received (against all Defendants)*

Mr. Radenne contends that each of the Defendants are liable for money had and received.[242] In support of his money had and received claim against the Defendants, Mr. Radenne contends that "Defendants hold money paid to them for the Corvette Defendants did not own and for modifications to a car that [Mr. Radenne] was not the legal owner of,"[243] and "[t]he money belongs to [Mr. Radenne] in equity and good conscience."[244]

---

[239] TEX. BUS. & COM. CODE § 2.106(d).
[240] *Jonibach Mgmt. Tr. v. Wartburg Enter., Inc.*, 136 F. Supp. 3d 792, 812 (S.D. Tex. 2015).
[241] TEX. BUS. & COM. CODE § 2.609(a).
[242] ECF No. 190, pg. 2, ¶ 1.A.
[243] ECF No. 10, pg. 17, ¶ 88.
[244] ECF No. 10, pg. 17, ¶ 89.

In Texas, a claim for money had and received is equitable in nature.[245] This equitable doctrine is in place to prevent unjust enrichment.[246] To establish this type of claim, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to plaintiff.[247] The Fifth Circuit has held that "a cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely at the inquiry, whether the defendant holds money, which belongs to the plaintiff."[248]

The undisputed evidence established that Duntov sent Mr. Radenne invoices pursuant to the Final Bill of Sale totaling $94,553.92, of which Mr. Radenne timely paid. Additionally, Mr. Radenne sent parts for the project to Duntov totaling an additional $1,250.77.[249] The undisputed evidence established further that Duntov obtained Court approval to sell the completed 1968 Corvette for $85,000, with such proceeds being placed into the Registry of the Court pending resolution of this litigation. There is no credible evidence in the record to establish that either Alan or Edward individually received the payments or goods totaling of $95,780.35 from Mr. Radenne.

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne failed to satisfy his burden to establish, in equity and good conscience, a claim for money had and received against Alan or Edward. Therefore, Mr. Radenne's claim of money had and received against Alan and Edward is ***DENIED*** and ***DISMISSED***.

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne has satisfied his burden to establish, in equity and good

---

[245] *Plains Exp. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015).
[246] *Id.*
[247] *Id.*; *see also Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548, 555 (W.D. Tex. 2017).
[248] *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (internal citations omitted).
[249] R-34 and R-35; ECF No. 220, pg. 108, lines 13–19; ECF No. 224, pg. 6.

conscience, a claim for money had and received against Duntov.  Pursuant to the Court's findings of fact and conclusions of law regarding the breach of contract and subsequent cancellation of the Final Bill of Sale contract against Duntov, *supra* in Section III.A.1. of this Memorandum Opinion, Mr. Radenne is entitled to the proceeds realized for the sale of the 1968 Corvette, which is currently held in the registry of the Court.  Therefore, Mr. Radenne's claim of money had and received against Duntov is ***GRANTED***, and Mr. Radenne is entitled to Judgment against Duntov for money had and received in the amount of ***$95,780.35***.  Additionally, as an offset to the Judgment, Mr. Radenne is entitled to the ***$85,000.00*** (plus accrued interest, if any) of sale proceeds for the 1968 Corvette that is currently held in the registry of the Court.

### 9.  *Alter Ego (against all Defendants)*

Mr. Radenne contends that he is entitled to a finding of alter ego relief against all the Defendants.[250]  Alter ego applies when the unity between a corporation and an individual is such that holding only the corporation liable would be unjust.[251]  A plaintiff shows alter ego through the total dealings of the corporation and the individual, which includes (i) the degree that corporate formalities have been followed and corporate and individual property have been kept separate; (ii) the amount of financial interest, ownership, and control the individual maintains over the corporation; and (iii) whether the corporation has been used for personal purposes.[252]

Mr. Radenne contends that (i) "Duntov was organized and operated as a mere tool or business conduit . . . of the Sevadjians;[253] (ii) "[t]he unity between one or both of the Sevadjians and Duntov was such that [there] was no meaningful separation between the two;"[254] and (iii)

---

[250] ECF No. 190, pg. 2, ¶ 1.A.; pg. 3, ¶ 1.C.; *see also* Tex. Bus. Orgs. Code § 21.223.
[251] *See* Tex. Bus. Orgs. Code § 21.223(b); *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986).
[252] *Castleberry*, 721 S.W.2d at 272.
[253] ECF No. 10, ¶ 91.
[254] ECF No. 10, ¶ 93.

"[o]ne or both of the Sevadjians did not observe the corporate formalities and exercised control over Duntov."[255]   Consequently, Mr. Radenne contends that "[t]he separate existence of Duntov should be pierced or ignored to hold one or both of the Sevadjians liable for the actions of Duntov."[256]

In support of his alter ego claim, Mr. Radenne makes the following contentions: (i) Alan and Edward have continually treated Duntov's corporate assets as their own assets;[257] (ii) at least three times over the years—in 2012, 2016, and 2019—Duntov's charter with the Texas Secretary of State was forfeited for briefs period of time;[258] (iii) Alan and Edward used Duntov to perpetrate a fraud on Mr. Radenne for their own personal benefit;[259] (iv) Alan and Edward are both alter egos of Duntov;[260] and (v) after Duntov obtained confirmation of its Chapter 11 Plan of Reorganization,[261] Alan and Edward caused reorganized Duntov to be sold for their own personal benefit.[262]   The Court disagrees.

Mr. Radenne failed to offer credible or persuasive evidence to establish his contentions that (i) Duntov's corporate formalities had not been followed, (ii) Alan or Edward failed to keep Duntov's assets separate from their own personal assets, (iii) Alan and Edward used Duntov to perpetrate a fraud on Mr. Radenne for their own personal benefit, or (iv) after Duntov obtained confirmation of its Chapter 11 Plan of Reorganization, Alan and Edward caused reorganized Duntov to be sold for their own personal benefit.  Rather, the credible evidence established that

---

[255] ECF No. 10, ¶ 95.
[256] ECF No. 10, ¶ 96.
[257] ECF No. 190, pg. 10, ¶¶ 5.N. and 5.O.
[258] R-134, R-136, and R-138; *see also* ECF No. 190, pg. 11, ¶ 5.O.; *see also* R-134, R-136, and R-138.
[259] ECF No. 190, pg. 26, ¶ 8.X.; *see also* ECF No. 224, § V, pgs. 18–22.
[260] ECF No. 190, pg. 26, ¶ 8.Y.
[261] *Duntov Motor Company LLC's First Amended Plan of Reorganization*, Bkr. ECF. No. 132 (the "**Duntov Plan of Reorganization**").
[262] ECF No. 190, pg. 11, ¶ 5.P.

Duntov was formed in 2008 and that Alan and Edward's actions were well within the corporate structure of Duntov.

Responding specifically to the forfeiture of Duntov's charter, the Defendants established that each of the defaults that caused the forfeitures were quickly corrected, and Duntov's charter was timely reinstated by the Texas Secretary of State.[263]

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne failed to offer adequate credible evidence to satisfy his burden to establish a finding of alter ego against the Defendants. Therefore, Mr. Radenne's claim of an alter ego finding against the Defendants is ***DENIED*** and ***DISMISSED***.

### 10. Determination of Nondischargeability Under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6) (against Duntov)

Mr. Radenne contends that his allowed claims against Duntov should be nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).[264] This Court previously ruled in this case that 11 U.S.C. § 1192(2) applies to except from discharge *debts of the kind* specified in § 523(a) for *all* debtors that are eligible under Subchapter V of Chapter 11, including limited liability corporations such as Duntov.[265]

### a. 11 U.S.C. § 523(a)(2)

Pursuant to 11 U.S.C. § 523(a)(2)(A), "[a] discharge . . . does not discharge an individual debtor from any debt—(2) for money, property, services, or an extension, renewal, or refinancing

---

[263] R-135, R-137, and R-139.

[264] ECF No. 190, pg. 2, ¶ 1.A.; pg. 3, ¶ 1.D.; pg. 25, ¶¶ P. through V.; *see also* 11 U.S.C. § 523(a)(2)(A) and (a)(6).

[265] See *Order Denying Defendant Duntov Motor, LLC's Motion to Dismiss Count IX Dischargeability Claim*, ECF No. 27. This Court was one of the first courts in the country to address this much debated issue. The Fourth Circuit Court of Appeals has since ruled on this issue consistent with this Court. Many other lower courts, however, disagree with this Court's ruling, including a Bankruptcy Court in the Western District of Texas. That court's opinion is currently on appeal before the Fifth Circuit Court of Appeals. Regardless on the ultimate ruling by the Fifth Circuit Court of Appeals, this Court's ruling is rendered moot by this Memorandum Opinion because Mr. Radenne failed to establish his claims on the merits.

of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[266]  A debt is non-dischargeable under this section upon a showing: "(1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance."[267] Section 523(a)(2)(A) has previously been interpreted to require the debtor to know the representation was false and have intended to deceive the creditor.[268]

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne failed to offer adequate credible evidence to satisfy his burden to establish that the Defendants made representations that they knew were false and with the intent to deceive Mr. Radenne.  Therefore, Mr. Radenne's claim seeking a nondischargeable judgment against Duntov under 11 U.S.C. § 523(a)(2) is **_DENIED_** and **_DISMISSED_**.

      *b.  11 U.S.C. § 523(a)(6)*

Pursuant to 11 U.S.C. § 523(a)(6), "[a] discharge... does not discharge an individual debtor from any debt—(6) for willful and malicious injury by the debtor to another entity or to the property of another entity."[269]  "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[270]  The United States Supreme Court held that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)."[271]

---

[266] 11 U.S.C. § 523(a)(2)(A).
[267] *In re Cardwell*, 487 Fed. Appx. 183, 185 (5th Cir. 2012) (citing *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005)).
[268] *Id.*
[269] 11 U.S.C. § 523(a)(6).
[270] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).
[271] *Id.* at 64.

The Fifth Circuit has held that for a debt to be nondischargeable, a debtor must have acted with "objective substantial certainty or subjective motive" to inflict injury.[272]  The words "willful and malicious" attach an implied malice standard that requires the debtor to have acted with "actual intent to cause injury."[273]

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that Mr. Radenne failed to offer adequate credible evidence to satisfy his burden to establish that the Defendants willfully and maliciously caused Mr. Radenne to suffer an injury.  Therefore, Mr. Radenne's claim seeking a nondischargeable judgment against Duntov under 11 U.S.C. § 523(a)(6) is ***DENIED*** and ***DISMISSED***.

**B.      Mr. Cooley's Claims and Causes of Action**

Mr. Cooley contends that the Duntov Frame and the 1968 Corvette is his stolen Cooley Vehicle and that he is entitled to the $85,000 in proceeds received from the sale of the 1968 Corvette, which is currently held in the registry of the Court.[274]

Based on the Court's review and analysis of the credible evidence in the record, including specifically the Court's findings of fact and conclusions of law detailed *supra* in Section II.G. of this Memorandum Opinion, the Court finds and concludes that Mr. Cooley failed to offer any credible evidence to satisfy his burden to establish that the Duntov Frame or the 1968 Corvette is his Cooley Vehicle.  The Court further finds and concludes that Mr. Cooley's factual contentions and legal positions are frivolous and without any merit.  Therefore, Mr. Cooley's claims and causes of action are ***DENIED*** and ***DISMISSED***.

---

[272] *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir.1998).
[273] *Id.* at 606.
[274] ECF No. 190, pg. 3, ¶ 2.A.

C.      **The Defendants' Counterclaims and Causes of Action**

The Defendants contend that Mr. Radenne breached the Final Bill of Sale contract.[275] Additionally, Alan contends that he is entitled to a declaratory judgment against Mr. Cooley concerning ownership of the Duntov Frame and the 1968 Corvette.[276]

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes that the Defendants failed to satisfy their burden to establish that Mr. Radenne breached the Final Bill of Sale contract. Therefore, the Defendants counterclaim against Mr. Radenne for breach of contract is ***DENIED*** and ***DISMISSED***.

Based on the Court's review and analysis of the credible evidence in the record, the Court finds and concludes Alan has satisfied his burden for a declaratory judgment against Mr. Cooley concerning the ownership of the Duntov Frame and the 1968 Corvette. Therefore, Alan's counterclaim for a declaratory judgment against Mr. Cooley is ***GRANTED***.

D.      **Attorneys' Fees and Costs Claims**

During a pre-trial hearing,[277] the parties stipulated and agreed to abate their respective rights, if any, to seek attorneys' fees and costs until a date after the entry of this Memorandum Opinion. Consequently, pursuant to Fed. R. Civ. P. 54,[278] any party seeking a claim for attorneys' fees, costs, and related nontaxable expenses must do so by filing a motion (the "***Attorneys' Fees Motions***") on or before ***December 15, 2023***.[279] Responses to any filed Attorneys' Fees Motion(s) must be filed on or before ***December 29, 2023***. The Court will then either rule on the submissions or set the Attorneys' Fees Motion(s) for hearing.

---

[275] ECF No. 190, pg. 4, ¶ 2.A.
[276] ECF No. 190, pg. 4, ¶ 2.B.
[277] ECF No. 187.
[278] Incorporated by Fed. R. Bankr. P. 7054.
[279] Given the intervening holiday season, the Court will extend these deadlines to later dates upon the request by any party.

## IV.    CONCLUSION

Following resolution of the Attorneys' Fees Motions, the Court will then enter a separate

final judgment consistent with this Memorandum Opinion.


**### END OF MEMORANDUM OPINION ###**